NICOLÁS VELÁZQUEZ PAGÁN, apelante y recurrente, *v.* AUTORIDAD METROPOLITANA DE AUTOBUSES, apelada y recurrida.

*Número:* CE-89-808 *Resuelto:* 15 de septiembre de 1992

*Demetrio Fernández*, abogado de la parte apelante y recurrente; *Pedro A. Delgado-Hernández*, de *O'Neill y Burgos*, abogado de la parte apelada y recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Este recurso cuestiona la constitucionalidad del Art. 107.52(11) y (17) del Reglamento de Personal de la Autoridad Metropolitana de Autobuses de 6 de diciembre de 1976, págs. 63 y 64 (en adelante Reglamento de Personal), y la Sec. 6 de la Ley de Personal del Servicio Público de Puerto Rico (en adelante Ley de Personal), 3 L.P.R.A. sec. 1371, que prohíben que un empleado público utilice su posición oficial para fines político-partidistas. Específicamente, se recurre de la sentencia del Tribunal Superior que confirmó la suspensión de empleo y sueldo del Sr. Ni-

colás Velázquez Pagán por solicitarle a unos suplidores de la Autoridad Metropolitana de Autobuses (A.M.A.) fondos para un partido político mientras dirigía el Negociado de Finanzas de esa corporación pública. Confirmamos.

El 7 de abril de 1986, el Sr. Nicolás Velázquez Pagán, Jefe del Negociado de Finanzas de la A.M.A., fue suspendido verbalmente de su empleo, sin privación de su sueldo, mientras se llevaba a cabo una investigación sobre unos hechos que podrían constituir una violación a las normas reglamentarias de la A.M.A. Una vez finalizada la investigación, el Sr. Mario A. Prieto Batista, Presidente y Gerente General de la Agencia, le comunicó a Velázquez Pagán que la investigación reveló que mientras desempeñaba su posición gerencial él había solicitado de unos suplidores de la A.M.A. una contribución para una actividad política. En particular, se encontró que Velázquez Pagán cursó comunicaciones al Sr. George E. Pickett, Gerente de Ventas de Tránsito de la compañía Mantruck Bus Corp. de Carolina del Norte y al Sr. R.W. Radeback, Representante de Ventas de la compañía GMC de Atlanta, Georgia, solicitando una aportación monetaria mediante la compra de unos boletos para asistir a una actividad a beneficio del Partido Nuevo Progresista.

La agencia citó a Velázquez Pagán para que compareciera a una vista informal el 9 de mayo de 1986 para dilucidar si había incumplido con las prohibiciones contra la utilización de su empleo para fines político-partidistas incluidas en el Art. 107.52(11) y (17) del Reglamento de Personal, *supra*,(¹) y en la Sec. 6 de la Ley de Personal,

---

(¹) "[Inciso 11:] Conducta impropia dentro o fuera del trabajo de tal naturaleza que afecte el buen nombre, refleje descrédito o ponga en dificultad a la Autoridad o a cualquier agencia o dependencia del Gobierno.

"[Inciso 17:] Utilizar su posición oficial para fines político partidistas o para otros fines no compatibles con el servicio público." Art. 107.52(11) y (17) del Reglamento de Personal de la Autoridad Metropolitana de Autobuses de 6 de diciembre de 1976, págs. 63 y 64.

*supra.*(²) Celebrada la vista informal y con efectividad a 15 de mayo de 1986, el apelante fue suspendido de empleo y sueldo por el término de treinta (30) días laborables. Oportunamente, el 3 de junio de 1986 este funcionario interpuso apelación ante el Comité de Apelaciones de la A.M.A. (Comité) impugnando la suspensión de empleo y sueldo de treinta (30) días y alegando que "[l]a medida disciplinaria impuesta obedec[ía] a un patrón de actos discriminatorios seguidos contra mi persona por estar afiliado al Partido Nuevo Progresista". El 30 de junio de 1986 el apelante renunció a su empleo.

El Comité, presidido por el Prof. Efraín González Tejera, mediante una extensa resolución confirmó la decisión de la agencia. Concluyó que entre enero y marzo de 1985 Velázquez Pagán firmó, conjuntamente con otro ejecutivo de la A.M.A., cinco (5) cheques por la cantidad de $51, 854 a favor de tres (3) importantes suplidores de piezas y equipos. Poco tiempo después, Velázquez Pagán envió cartas con textos idénticos a dos (2) de estos suplidores solicitando que compraran boletos para una actividad que se celebraría en el Hotel San Juan para recaudar fondos para el Partido Nuevo Progresista. En sus misivas, Velázquez Pagán afirmó que "estamos seguros de que ustedes apreciarán la enorme importancia de este tipo de contribución que nos ayudará al logro de las metas por las cuales hemos trabajado con tanta devoción por tantos años". (Traducción nuestra.) Apéndice, pág. 27. En una parte de las cartas se afirmó que la solicitud era de índole personal y no estaba relacionada con la A.M.A.

En su resolución, el Comité afirmó que el representante de la General Motors, Sr. R.W. Radeback, al recibir la pe-

---

(²) "(2) Utilizar su posición oficial para fines político partidistas o para otros fines no compatibles con el servicio público.

. . . . . . .

"(4) Observar conducta incorrecta o lesiva al buen nombre de la agencia o al Gobierno de Puerto Rico." 3 L.P.R.A. sec. 1371.

tición de fondos se comunicó con el Gerente General de la A.M.A. inquiriendo sobre la naturaleza de la carta y éste, inmediatamente, ordenó una investigación que dio lugar a la suspensión del funcionario. El Comité también concluyó que anteriormente Velázquez Pagán "había hecho iguales solicitudes de contribuciones monetarias para el P.N.P. a los funcionarios de los suplidores de la A.M.A. ...".

En vista de estas determinaciones, el Comité declaró sin lugar la apelación. Resolvió que cuando Velázquez Pagán solicitó "aportaciones económicas para fines político-partidistas de esos funcionarios, no dejó de hacerlo en su condición de elevado oficial de la empresa para la cual servía, por más que en sus cartas hiciera constar que lo hacía como ciudadano particular y no como funcionario de la A.M.A.". Apéndice, pág. 29.

Además, rechazó la tesis de Velázquez Pagán de que la suspensión de treinta (30) días se debía a motivaciones políticas. El Comité determinó que, aunque en la A.M.A. se habían vendido "boletos y rifas para actividades políticas tanto del P.N.P. como del P.P.D. en horas laborables y en facilidades de la A.M.A., el Presidente había formulado cargos a varios empleados incluyendo "al Sr. Francisco Agosto, Presidente de 'Batey Popular' ".([3]) Apéndice, pág. 17.

Oportunamente, Velázquez Pagán interpuso recurso de revisión ante el Tribunal Superior, Sala de San Juan. Aceptó como válidos los hechos determinados por el Comité de Apelaciones pero cuestionó la sanción disciplinaria. Evaluado el recurso, y en vista de que el peticionario aceptó las determinaciones de hecho del Comité, el Tribunal Superior resolvió que "la solicitud de fondos que el empleado aquí recurrente llevó a cabo claramente constituyó la utilización de su posición como funcionario de una agen-

---

([3]) El señor Agosto fue testigo del señor Velázquez Pagán en la vista evidenciaria.

cia del gobierno para fines político-partidistas, algo que no sólo es contrario a la ley y a los reglamentos aplicables, sino algo a lo que *ningún empleado público tiene derecho constitucional.* El poner en la carta que la solicitud de fondos estaba siendo hecha en su carácter personal y no como consecuencia de la posición que ocupaba en la compañía es un subterfugio que no engaña a nadie, ni a las personas a quienes la carta iba dirigida ni a este Tribunal".

Mediante petición de *certiorari* recurre ante nos la parte demandante y alega que el tribunal incidió por lo siguiente:

> Cometió grave error de derecho el Honorable Tribunal sentenciador al decretar que no había habido violación al derecho constitucional de la libertad de expresión y la libertad política del recurrente.

En su escrito, Velázquez Pagán ratifica que acepta "como válidos los hechos pertinentes determinados por el Comité que se encuentran contenidos en su Resolución de 29 de julio de 1988. De manera específica los relativos a la solicitación de la contribución que hiciera el recurrente a los suplidores". Apéndice, pág. 4. No obstante, alega que de la faz de los reglamentos y en su aplicación se puede concluir que éstos son inconstitucionales. Señala que dichos reglamentos adolecen de amplitud excesiva al limitar su conducta protegida por la libertad de expresión.

Por constituir una controversia jurídica de interés público, expedimos el auto solicitado. La parte recurrida ha comparecido. Confirmamos.

I

■. Inspirada en la Primera Enmienda de la Constitución de Estados Unidos, nuestra Carta de Derechos en su Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, consagra la protección de todo ciudadano a la libre expresión. Este de-

recho es parte integral del ejercicio pleno de la libertad de conciencia, de pensamiento y "las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de estos derechos". Diario de Sesiones, pág. 2569 (1982). Este derecho fue concebido no solamente como una protección de la expresión política, sino también para facilitar el desarrollo pleno del individuo y estimular el libre intercambio y la diversidad de ideas, elementos vitales del proceso democrático. Véanse: Merklejohn, *Free Speech and Its Relation to Self-Government*, 1984; Emerson, *The System of Freedom of Expression*, 1970; M.H. Redish, *Freedom of Expression: A Critical Analysis*, Virginia, The Michie Company, 1984.[4]

■ La libertad de expresión representa el derecho constitucional de todo ciudadano de expresar libremente sus ideas en una sociedad pluralista sin restricción gubernamental en cuanto al contenido, forma y manera en que ésta se manifiesta. "Por supuesto este valor superior no supone una irrestricción absoluta, de forma que no pueda subordinarse a otros intereses cuando la necesidad y conveniencia públic[a] lo requieran." Véanse: *Mari Bras v. Casañas*, 96 D.P.R. 15, 21 (1968); *Aponte Martínez v. Lugo*, 100 D.P.R. 282, 290 (1971); *Sánchez Carambot v. Dir. Col. Univ. Humacao*, 113 D.P.R. 153 (1982); *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979); *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229 (1988).

■ No obstante, el Estado, al programar una convivencia social ordenada, debe tener mucho cuidado al establecer limitaciones al ejercicio del derecho a la libre expresión.

---

[4] Para un estudio histórico sobre el derecho constitucional a la libre expresión en Puerto Rico y Estados Unidos, véanse: R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1270–1278; T.L. Tedford, *Freedom of Speech in the United States*, Nueva York, Ed. Random House, 1985, págs. 3–63; 4 *Rotunda, Nowak y Young, Treatise on Constitutional Law: Substance and Procedure* Secs. 20.2–20.6 (1992).

Véase *Pueblo v. Santos Vega*, 115 D.P.R. 818, 822 (1984). "[L]as leyes que en alguna forma limitan el derecho constitucional de la libertad de expresión, deben ser interpretadas restrictivamente a fin de que esa limitación no traspase el límite de lo absolutamente necesario." *Pueblo v. Burgos*, 75 D.P.R. 551, 570 (1953); *Mari Bras v. Casañas*, supra; *Rodríguez v. Srio. de Instrucción*, supra.

Al examinar los estatutos que limitan el ejercicio a la libre expresión, los tribunales han distinguido entre la reglamentación del contenido y la del tiempo, lugar y manera. En cuanto al contenido de la expresión se han confeccionado las doctrinas de vaguedad y amplitud excesiva. Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1319–1324. Ante una alegación de una parte sobre la posible vaguedad de una ley o la amplitud excesiva de ésta, los tribunales deben tener mucho cuidado en no confundir ambos conceptos.

En *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139 (1973), adoptamos los pronunciamientos del Tribunal Supremo Federal en *Grayned v. City of Rockford*, 408 U.S. 104 (1972), sobre la vaguedad de los estatutos. Allí se dijo que "[e]s un principio básico del debido procedimiento que una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. Las leyes imprecisas violentan diversos valores importantes ... insistimos que las leyes den a la persona de ordinaria inteligencia una oportunidad razonable para saber lo prohibido, de modo que pueda actuar en concordancia con ese conocimiento ... si ha de prevenirse la aplicación arbitraria y discriminatoria, las leyes deben proveer normas claras para aquellos que las aplican ... cuando un estatuto impreciso empalma con áreas sensitivas de las libertades básicas y garantizadas por la Primera Enmienda; opera para inhibir el ejerci-

cio de [esas] libertades". (Traducción nuestra.)[5] Cuando se trata de la libertad de expresión, la ley debe contener más claridad que la que se exige a un estatuto penal. Véanse, a modo ilustrativo: *Grayned v. City of Rockford*, supra; *Smith v. Goguen*, 415 U.S. 566 (1974); Serrano Geyls, *op. cit.*

■ Ahora bien, cuando hablamos de amplitud excesiva nos referimos a una ley que aspira a prohibir o castigar expresiones que no gozan de la protección constitucional pero que por razón de haber sido redactada o interpretada imprecisamente tiene el efecto de prohibir o castigar expresiones constitucionalmente protegidas. "El problema básico es que la ley excesivamente amplia desalienta o enfría (*chill*) la expresión protegida por la Constitución porque los encargados de ponerla en vigor tienen entonces demasiada discreción y pueden usar la ley para proscribir palabras constitucionalmente válidas." Serrano Geyls, *op. cit.*, pág. 1320. Véanse, además: *Pueblo v. Hernández Colón*, 118 D.P.R. 891 (1987); *Mari Bras v. Casañas*, supra; *Pacheco Fraticelli v. Cintrón Antonsanti*, supra.[6]

■ El tribunal, al ponderar los intereses en conflicto, debe determinar si la ley impugnada, de su faz, contiene una amplitud excesiva sustancial en relación con el alcance legítimo que la medida pueda tener sobre una con-

---

[5] La ley adolece de vaguedad si "1) una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende prohibir y penalizar; 2) se presta a la aplicación arbitraria y discriminatoria e; 3) interfiere con el ejercicio de derechos fundamentales garantizados por la Constitución". Véanse: *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229 (1988).

[6] Existe mucha literatura sobre el desarrollo de la doctrina de amplitud excesiva o *overbreadth* en Estados Unidos. Véanse: L.A. Alexander, *Is there an Overbreadth Doctrine*, 22 San Diego L. Rev. 541 (1985); Fallon, *Making Sense of Overbreadth*, 100 Yale L.J. 853 (1991); Nota, *The First Amendment Overbreadth Doctrine*, 83 Harv. L. Rev. 844 (1969–1970); Redish, *The Warren Court, The Burger Court and the First Amendment Overbreadth Doctrine*, 78 Nw. U. L. Rev. 1031 (1984); Anotación, *Supreme Court's Views as to Overbreadth of Legislation in Connection with First Amendment Rights*, 45 L.Ed. 2d 725 (1976).

ducta que no está protegida. *Pueblo v. Hernández Colón*, supra, pág. 899. Véanse, a modo ilustrativo: *Boss v. Barry*, 485 U.S. 312 (1988); *Houston v. Hill*, 482 U.S. 451 (1987); *Secretary of State of Md. v. H. Munson Co.*, 467 U.S. 947, 964–965 (1984); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973); *Brockett v. Spokane Arcades Inc.*, 472 U.S. 491 (1985); *New York v. Ferber*, 458 U.S. 747 (1982); *Rotunda, Nowak y Young*, supra, sec. 20.8, pág. 30; Nimmer, *Nimmer on Freedom of Speech* Sec. 4.11(B), pág. 4-150 (1984); L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, Secs. 12–28, págs. 1024–1029.

## II

Examinada brevemente la normativa prevaleciente a utilizarse para examinar una legislación o reglamentación que limita la libertad de expresión, procede analizar la validez de las restricciones gubernamentales sobre el derecho de los empleados públicos a expresarse libremente.

■ Al reflexionar sobre la controversia de autos, reiteramos que no es permisible dentro de nuestro orden constitucional que un ciudadano tenga que renunciar al ejercicio de su derecho a la libre expresión, como condición a obtención de un empleo público. Véanse: *Keyishian v. Board of Regents*, 385 U.S. 589, 605–606 (1967);[7] *Pickering v. Board of Education*, 391 U.S. 563–568 (1968); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Sin embargo, esto no quiere decir que este derecho sea absoluto ni que toda su conducta está constitucionalmente protegida. Es preciso definir sus contornos.

---

[7] Esto no fue siempre así. Antes de esta decisión, la visión que existía en Estados Unidos era de indiferencia al reconocimiento de los reclamos de los empleados públicos a su libertad de expresión en su empleo. Véanse: *Adler v. Board of Education*, 342 U.S. 485 (1952); *McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 29 N.E. 517.(1892); D.H. Milbrath, *The Free Speech Rights of Public Employees: Balancing with the Home Field Advantage*, 20 (Núm. 3) Idaho L. Rev. 703 (1984).

Fue en el caso de *Pickering v. Board of Education*, supra, en el que inicialmente el Tribunal Supremo federal se pronunció sobre el alcance de la protección de la Primera Enmienda a los empleados públicos. El profesor Pickering escribió una carta dirigida a un periódico, en la que criticaba la manera en que la administración distribuyó los fondos para la construcción de una nueva escuela y sus métodos para informar al público sobre las necesidades económicas de la escuela. Por dicha carta fue despedido. El Tribunal Supremo estatal confirmó diciendo que como él había aceptado ser maestro de una escuela pública debía abstenerse de hacer comentarios sobre la administración escolar. Al revocar, el Tribunal Supremo federal rechazó la tesis de que los maestros de escuelas públicas renunciaron a su derecho a la libre expresión que, como todo ciudadano, tienen sobre asuntos de interés público incluyendo lo relativo a la administración del sistema de instrucción pública. Íd., pág. 568. Estas consideraciones están fundamentadas en la premisa de que en nuestro sistema democrático el empleado, por el hecho de expresarse sobre asuntos públicos legítimos, no necesariamente perjudica la labor interna del lugar de trabajo.

No obstante, también reconoció que el Estado tenía un interés legítimo en establecer las condiciones necesarias para mejorar la productividad de los empleados públicos. Por ende, resolvió que la solución al problema conlleva un *balance* entre el interés del maestro de opinar sobre asuntos de interés público (*public concern*) y del Estado de promover la mejor eficiencia y productividad del servicio público a través de sus empleados. "El problema en cualquier caso es lograr un balance entre el interés del maestro, como ciudadano, de comentar sobre asuntos de interés público y el interés del estado, como patrono, en promover la eficiencia de los servicios públicos ofrecidos por sus empleados." (Traducción nuestra.) *Pickering v. Board of Education*, supra, pág. 568.

Casi diez (10) años más tarde, el Supremo federal en *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274 (1977), resolvió otro caso de despido de un maestro de instrucción pública como consecuencia de unas expresiones públicas. Al resolver esa controversia, el más alto foro federal afirmó que el demandante tiene el peso inicial de probar, por preponderancia de la prueba, que la conducta protegida fue el factor sustancial para su despido. Una vez el demandante prueba su caso *prima facie*, le corresponde al Estado demostrar que de todas maneras lo hubiera despedido o hubiera tomado otras medidas disciplinarias por razones distintas a las de restringir su libre expresión. Por su parte, el demandante puede entonces presentar prueba de que no hubiese sido despedido, salvo por las expresiones protegidas. *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990). Véase, además, *Givhan v. Western Line Consol. School Dist.* 439 U.S. 410 (1979).

A la luz de esta jurisprudencia, podemos coincidir en que en la jurisdicción federal existen dos (2) categorías de expresiones de empleados públicos. La primera es aquella que el empleado hace sobre un asunto de preocupación pública. La segunda es aquella que sólo trata sobre asuntos de interés personal. La protección constitucional de la Primera Enmienda comprende la primera, pero no la segunda. *Connick v. Myers*, 461 U.S. 138 (1983). Para hacer una determinación de cuáles son las expresiones protegidas, lo crucial entonces es decidir cuáles son los asuntos de preocupación pública.([8]) Esto será una determinación de derecho y no de hecho. Íd., pág. 148.

---

([8]) Véanse: S. Allred, *From Connick to Confusion: The Struggle to Define Speech on Matters of Public Concern*, 64 (Núm. 1) In. L.J. 43 (1988); Nota, *Beyond "Public Concern": New Free Speech Standards for Public Employees*, 57 V. CH 1.L. Rev. 249 (1990); Nota, *Connick v. Myers: Narrowing the Free Speech Right of Public Employees*, 33 (Núm. 2) Catholic U.L. Rev. 429, 446 (1984); Estlund, *Speech on Matters of Public Concern: The Perils of an Emerging First Amendment Category*, 59 Geo. Wash. L. Rev. 1, 4 (1990).

En *Connick v. Myers*, supra, págs. 147–148, se dijo que: "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Además, este caso añade que se deberá tomar en consideración, el tiempo y lugar donde se hizo la expresión. Íd., pág. 152.

El último en esta progenie de casos siguientes a *Pickering v. Board of Education*, supra, lo es *RanKin v. McPherson*, 483 U.S. 378 (1987), que aclara que lo determinante en el análisis del balance de *Pickering*, supra, y *Connick v. Myers*, supra, es la eficiencia en el lugar de trabajo. Reitera que los elementos de manera, tiempo, lugar y contexto son consideraciones relevantes para el buen balance de intereses. Por otra parte, añade un nuevo criterio a tomarse en cuenta al momento de hacer dicho balance, éste es la autoridad o grado de responsabilidad del empleado en su lugar de trabajo. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin v. McPherson*, supra, pág. 390. Véase Hiers, *First Amendment Speech Rights of Government Employees:Trends and Problems in Supreme Court and Fifth Circuit Decisions,* 45 (Núm. 2) S.W.L.J. 741 (1991).

### III

En el caso particular de la reglamentación del Estado de las actividades político-partidistas de sus empleados, tanto el Supremo federal como esta Curia han convalidado ciertas restricciones que tienen el propósito de aislar al personal de servicio público de la actividad partidista "de modo que la política no dañe el empleo ni lesione al empleado público". *Hermina González v. Srio. del Trabajo,* 107 D.P.R. 667, 672 (1978). *Véase United States Civil*

*Service Commission v. National Association of Letter Carriers*, 413 U.S.J. 48, 93 S. Ct. 2880, 37 L.Ed. 2d 796 (1973).

El principio rector de estas decisiones es que existe un interés apremiante del Estado en evitar que la administración pública no esté al servicio del "empleado *público-político activo*". (Énfasis en el original.) *Hermina González v. Srio. del Trabajo*, supra, pág. 672. Esta norma también ayuda a evitar que a los empleados públicos se les requiera, como condición de empleo y desde la plataforma de su trabajo, llevar a cabo actividades político-partidistas:

> El Tribunal ha reconocido que el interés del gobierno por regular la conducta y la expresión de sus empleados es diferente de su interés por regular la conducta y la expresión de la ciudadanía en general. Son varias las razones. Primero, la influencia que ejercen los empleados del gobierno se expande y afecta cada vez más el quehacer cotidiano de los ciudadanos privados. Permitir que un empleado saque ventaja política por razón de su empleo desprestigia al gobierno y puede inducir a que se le falte el respeto a los funcionarios públicos. Segundo, la participación de los empleados públicos en la política puede constituir una amenaza al funcionamiento efectivo del gobierno. Es esencial que los empleados gubernamentales implementen la voluntad del Congreso sin dejarse influir por las directrices de un partido político. Vol. 4, sec. 20.52 (1992).

En el caso particular de Puerto Rico, el Estado y sus instrumentalidades constituyen el patrono principal del país con un 23.1% de la fuerza laboral con alrededor de doscientos once mil (211,000) empleados. Informe Económico al Gobernador, 1990, Cap. X, pág. 10. Por la importancia del sector gubernamental en la economía, y particularmente en los empleos en nuestro país, se han adoptado una serie de restricciones sobre la actividad política partidista de los empleados públicos para evitar que el partido en el poder utilice indebidamente el poder del Estado para su propio beneficio. La sec. 6 de la Ley de Personal, *supra*, intenta lograr estos propósitos. Por eso tajantemente pro-

hibe que los empleados públicos utilicen "su posición oficial para fines político partidistas …". 3 L.P.R.A. sec. 1371(2).

Al evaluar sus contornos, tenemos presente que esta legislación forma parte de un ordenamiento mucho más abarcador que se ha establecido para darle vitalidad al ideal legislativo y constitucional de igualdad en el debate político. Nuestros pronunciamientos constitucionales reconocen como objetivos legítimos consustanciales al proceso democrático la facultad de imponer limitaciones que tengan el propósito de evitar la competencia injusta, la desigualdad económica y las ventajas indebidas en el proceso electoral. Al amparo de estos principios rectores en *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 751 (1976), resolvimos que

> … son cognocibles, como objetivos legítimos consustanciales al proceso democrático, medidas razonables tendentes a disminuir las diferencias económicas y ventajas entre los partidos y candidatos por razón de desigualdades en riqueza, a la par que evitar contribuciones cuantiosas e irrestrictas que pudieran comprometer el curso ulterior del gobierno en orden a influencias indebidas o favoritismos por razón de tales aportaciones.

Igualmente, en *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 645–646 (1984), decretamos la inconstitucionalidad del Art. 3.011 de la Ley Electoral, 16 L.P.R.A. sec. 3108c, que autorizaba el uso ilimitado para fines político-partidistas de los automóviles del Gobierno: "Ello así por cuanto es negativo al mejor desenvolvimiento de un sano proceso político democrático el que determinado partido político utilice fondos y/o recursos públicos para sus particulares fines privados. En la medida en que los fondos públicos se utilicen para propaganda político partidista se está afectando detrimentalmente el derecho de los demás electores."

Con estos mismos propósitos se aprobó legislación para proscribir que en el año de elecciones el Estado incurra en gastos para difundir en los medios "sus programas, proyectos, logros, realizaciones, proyecciones o planes". 16

L.P.R.A. sec. 3351. También se prohibió penalmente que un empleado o funcionario público "usare fondos o dispusiere de propiedad pública para el uso de un partido político o candidato ...". 16 L.P.R.A. sec. 3360.

Además de promover una sana y eficiente administración pública, este ordenamiento asegura que no se discrimine políticamente en los servicios gubernamentales. También evita que los "remedios provistos por nuestro Derecho positivo para proteger al empleado público de la persecución, el discrimen y la erosión política no ... [estén] al servicio del empleado *público-político activo*". (Énfasis en el original.) *Hermina González v. Srio. del Trabajo*, supra, pág. 672.

Evaluada la normativa aplicable, procede que consideremos los señalamientos de Velázquez Pagán.

## IV

En el caso de autos, el recurrente alega, entre otras cosas, que suspensión se debió a discrimen por razones políticas. No estamos de acuerdo.

El despido de un empleado público, por sus creencias políticas, viola la protección constitucional que le garantiza la Primera Enmienda de la Constitución de Estados Unidos y la Sec. 6 del Art. II de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, a todo ciudadano de asociarse. A menos que el Gobierno pueda demostrar "un interés superior" de importancia vital que requiera que las creencias privadas de la persona coincidan con la autoridad nominadora, sus creencias no pueden constituir la razón única para privarlo de continuidad en el empleo". *Branti v. Finkel*, 445 U.S. 507, 515 (1980), citando a *Elrod v. Burns*, 427 U.S. 347 (1976); *Ramos v. Srio. de Comercio*, 112 D.P.R. 514, 516 (1982); *McCrillis v. Aut. de Las Navieras* de P.R., supra; *Rodríguez Cruz v. Padilla Ayala*, supra.

En el caso de autos el recurrente no presentó ninguna prueba que indicara que había sido objeto de un discrimen por razón de sus creencias políticas.[9]

Hemos dicho "que la mera alegación de un hecho básico sin que haya sido debidamente establecido no activa una presunción que permita la inferencia de un hecho presumido ... el demandante tendría que establecer la ausencia de motivo racional para el despido y la sustitución por otro empleado de diferente afiliación política, que resulta afín con la de la autoridad nominadora". *Báez Navedo v. Municipio de Barceloneta*, 113 D.P.R. 421 (1982); *McCrillis v Aut. de las Navieras de P.R.*, supra.

## V

Velázquez Pagán también alega que el Art. 107.52(11) y (17) del Reglamento de Personal, *supra*, son inconstitucionales por adolecer de amplitud excesiva. Al evaluar su señalamiento, tenemos presente que aunque se le imputaron violaciones de las dos (2) secciones del Art. 107.52, de las resoluciones recurridas se desprende que la conducta que dio lugar a los sanciones disciplinarias fue la utilización de su posición oficial para solicitar fondos para fines político-partidistas. También partimos de la premisa de que la conducta que origina la controversia no fue la utilización de botones, insignias o mensajes alusivos a una disputa obrero-patronal relacionada con una actividad concertada. Véase *P.R.T.C. v. Unión Indep. Emp. Telefónicos*, 131

---

[9] En la sentencia dictada por el Hon. Juez Ángel G. Hermida del Tribunal Superior, Sala de San Juan, se señala que "aunque en el recurso se dice que la AMA 'ha permitido y condonado otras actividades análogas de carácter político que se han efectuado para recaudar fondos para el Partido Popular Democrático', y se añade que 'el récord del presente caso contiene prueba documental acreditativa a ello' ... *no hay absolutamente nada en el recurso sometido ante nos que substancie dicho señalamiento*". (Énfasis suplido.) Apéndice, pág. 35. Además, como cuestión de hecho, el Comité de Apelaciones concluyó específicamente que no había ocurrido ningún discrimen por razón política.

D.P.R. 171 (1992). Tampoco estamos ante un reclamo de un empleado al derecho de libre expresión de un mensaje de naturaleza política, económica o social en un foro público o semi público.

En vista de que la sanción disciplinaria fue por violación del Art. 107.52(17) del Reglamento de Personal, *supra*, en correcta metodología adjudicativa constitucional procede que examinemos únicamente la validez de esta sección.

■ Como resultado de nuestra decisión en *Torres Ponce v. Jiménez*, 113 D.P.R. 58 (1982), la A.M.A. adoptó el Reglamento de Personal para sus empleados gerenciales incorporando el principio de mérito para regular y proteger a los empleados ejecutivos. Fundamentada en la Sec. 6 de la Ley de Personal, *supra*, el inciso (17) prohíbe que el empleado gerencial utilice su posición oficial para fines político-partidistas o para otros fines no compatibles con el servicio. Su propósito principal es proscribir que el empleado gerencial de la A.M.A. se aproveche de su posición y utilice los medios y recursos que tiene a su alcance para beneficio de cualquier partido político. Entre estas actividades, claramente prohibidas por ese inciso, está la colocación de insignias político-partidistas en los vehículos de la A.M.A. o en sus facilidades, y el uso ilimitado de los autobuses y automóviles para campaña partidista. Véase *Marrero v. Mun. de Morovis*, supra. También está prohibido que el personal gerencial utilice su posición para recaudar fondos para determinado partido político o para distribuir propaganda política entre los usuarios y suplidores de la A.M.A.

En la medida que esta disposición proscribe que los empleados gerenciales utilicen sus cargos para fines político-partidistas, la misma castiga o prohíbe solamente la conducta que no está protegida. Al interpretar sus contornos, es evidente que tiene un propósito de prohibir únicamente aquellas actuaciones de un empleado gerencial que se

aprovecha de los recursos o medios de la A.M.A. para el beneficio de un partido político.

 Es innegable que la eficiencia del servicio de la A.M.A. y las demás corporaciones está estrechamente ligada con su funcionamiento interno. Con el propósito de rendir un mejor servicio, estas empresas públicas han establecido una reglamentación de su personal gerencial tendente a establecer un ambiente de mayor productividad. Dentro de este ámbito, el Estado puede restringir las actividades políticas de los empleados gubernamentales. Véanse: *Hermina González v. Srio. del Trabajo*, 107 D.P.R. 667, 673 y 674 (1978); *CSC v. Letter Carriers*, 413 U.S. 548 (1973); Anotación, *Dismissal of, or other Adverse Personnel Action Relating to, Public Employee for Political Patronage Reasons as Violative of First Amendment*, 70 A.L.R. Fed. 371 (1984); Anotación, *Validity, Construction and Effect of State Statutes Restricting Political Activities of Public Officers or Employees*, 51 A.L.R.4th 702 (1987).

Hemos dicho que "[e]n Puerto Rico aspiramos a que el personal gubernamental forme un cuerpo de servidores públicos eficientes, honestos y que en su escala de valores guarden mayor lealtad a su compromiso de servir al pueblo en las distintas áreas que su vocación les ha llevado a ocupar, que al fervor eleccionario por dominar el poder público y envolver los empleados en los vaivenes del patronazgo político". *Hermina González v. Srio. Trabajo*, supra, pág 671. Estas aspiraciones son extensivas tanto a los empleados públicos de las agencias como a los de las corporaciones públicas. En una sociedad en la que las corporaciones públicas rinden servicios esenciales, sus empleados no deben interponer sus intereses particulares ante los intereses colectivos. Este interés apremiante del Estado posterga el interés del empleado público de utilizar su posición oficial para fines políticos-partidistas.

Estas restricciones de conducta, aunque podrían tener

algún efecto sobre el ejercicio a la libre expresión, no son substanciales. La reglamentación en el caso de autos no padece de amplitud excesiva. No obstante, examinemos la interpretación administrativa que dio lugar al presente recurso para ver si lesiona sustancialmente la libertad de expresión de Velázquez Pagán.

## VI

El Comité, en sus determinaciones de hecho, encontró que Velázquez Pagán se desempeñaba como Jefe del Negociado de Finanzas, puesto que ocupó hasta el día 30 de junio de 1986 en que renunció en la agencia.([10]) Que "[e]l 5 de marzo de 1986, el apelante envió dos cartas con textos idénticos, una al Sr. George E. Picket, Gerente de Ventas de M.A.N. y otra a R.W. Radeback, representante de ventas de GM Truck and Coach Operation". Apéndice, pág. 16. También se determinó que en esas cartas se solicitó la compra de unos boletos para una actividad el 11 de abril de 1986 con motivo de "recaudar fondos para el respaldo de nuestro Partido Nuevo Progresista". (Traducción nuestra.) Íd. En la resolución se citan extensamente las partes de la carta donde se afirma que "estamos seguros que usted aprecia la enorme importancia de este tipo de contribución que nos ayudará a luchar por los ideales por los cuales hemos trabajado tan devotamente por tantos años". (Traducción nuestra.) Íd. El costo de los boletos era de $100 y los cheques debían estar hechos a nombre de "Feliz cumpleaños Presidente".

Finalmente, el Comité concluyó que el recurrente "cono-

---

([10]) Cabe destacar el hecho que aunque el apelante renunció a su trabajo, éste continuó impugnando judicialmente su suspensión de empleo y sueldo por los treinta (30) días. Considerando que de tener razón, el peticionario sería acreedor a que se le compensara por el mes en que fue suspendido y que se eliminara este hecho de su historial de trabajo, la controversia que origina este recurso no es académica. Véanse: *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991); *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991).

ció a los señores Picket y Radeback por razón de su posición como funcionario de la A.M.A." (Apéndice, pág. 17) y que con anterioridad a 1986 el recurrente había realizado las mismas solicitudes de contribuciones monetarias para el Partido Nuevo Progresista a los funcionarios corporativos antes mencionados.

El recurrente alega que, como la carta se hizo fuera del taller de trabajo y no en su carácter oficial, está protegido por su derecho a la libre expresión. No tiene razón. Definitivamente, la carta enviada era una comunicación escrita de un interés particular. Esto es, conseguir fondos para fines político-partidistas. Sin embargo, no contenía ninguna referencia a una preocupación pública en general. Aunque se hizo fuera del lugar de trabajo, debemos analizar su contexto, manera y quién la envía para saber si pudiera afectar el funcionamiento de la Agencia.

Al realizar el balance de intereses debemos recordar que las responsabilidades del empleado son muy importantes al momento de sopesar los intereses en conflicto. *Rankin v. McPherson*, supra, pág. 390. En el caso de autos no se trata de un empleado que no tenía ninguna ingerencia con los asuntos internos y externos de la agencia. Velázquez Pagán era el Jefe del Negociado de Finanzas de la A.M.A. Sus labores consistían "en administrar la parte financiera de la Autoridad, controlar los desembolsos, autorizar todos los pagos de la A.M.A. y firmar los respectivos cheques, supervisar la contabilidad de la apelada y ayudar a implementar la política pública sobre las finanzas de la Autoridad". Apéndice, pág. 16. Sus responsabilidades revestían una gran importancia para la Agencia.

Por otro lado, sus cartas solicitaban fondos para un partido político y estaban dirigidas a grandes corporaciones que le suplían materiales y equipo de transportación a la A.M.A. y que éste había conocido por su posición en la agencia. En ese período de tiempo la A.M.A. había adquirido equipo de estos suplidores y Velázquez Pagán había

firmado los cheques correspondientes. Velázquez Pagán pretende que, bajo el subterfugio de enviarlas en su nombre propio, se le proteja su derecho a la libre expresión. Este es precisamente el tipo de actuación en que se inspiró el ex Juez Asociado Señor Serrano Geyls al decir en *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 582 (1961): "Los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería."

██ Este tipo de conducta podría afectar las relaciones de la Agencia con sus suplidores, quienes están en un negocio en el que quieren mantener buenas relaciones con sus clientes. Sin duda alguna, cuando reciben una comunicación escrita de la persona encargada del pago por sus servicios, sienten que deben responder para mantener unas buenas relaciones comerciales con sus clientes. El empleado público no puede aprovecharse de su posición oficial para adelantar causas político-partidistas que en nada ayudan al interés general o a la entidad gubernamental para la que trabaja. Las relaciones comerciales entre las instrumentalidades públicas y la empresa privada deben estar libres de toda reciprocidad por favores políticos.

Precisamente porque los suplidores pensaron que la petición de fondos estaba vinculada a su relación contractual con la agencia, uno de ellos llamó al Gerente General de la A.M.A. para inquirir sobre la misiva. De esta manera esa empresa evitó incurrir en una violación de la Ley Electoral. El Art. 8.012A de la Ley Electoral expresamente prohíbe a estas empresas contribuir a partidos políticos o candidatos:

> Toda persona natural o jurídica que esté en proceso de concesión de permisos o franquicias, de adjudicación o de otorgamiento de uno o más contratos de compra y venta de inmuebles, de prestación de servicios, de materiales, de alquiler de terrenos, edificios, equipo o de construcción de obra pública con el Estado Libre Asociado de Puerto Rico, sus agencias, instrumentalidades públicas o sus municipios o que esté sujeto a la regla-

mentación de éstos, ofrezca, efectúe, reciba o solicite, directa o indirectamente mientras dura dicho proceso de adjudicación u otorgamiento, contribución alguna, ya sea monetaria o de otra índole con el propósito de obtener ... o beneficiarse de dicho ... otorgamiento, prestación, en apoyo de un partido político, candidato ... será sancionada con pena de reclusión por un término fijo de nueve (9) años. 16 L.P.R.A. sec. 3362a.

En el caso de personas jurídicas, la Ley Electoral establece una multa de cien mil dólares ($100,000) a los que incurren en violación de esta disposición. También se exponen a la cancelación de sus certificados de incorporación o la disolución, suspensión o revocación de sus licencias. 16 L.P.R.A. sec. 3362.

En el caso de autos, la normativa anteriormente expuesta aísla al personal gerencial de la actividad partidista, sin infringir su derecho a expresarse sobre asuntos de interés público, y asegura que en el *descargo de sus obligaciones* siempre tenga el bienestar del país por encima de sus aspiraciones políticas. Quedan garantizados a través de ellas el principio de igualdad política en el proceso electoral y se imparte vitalidad a nuestro ordenamiento democrático.

Por los fundamentos antes expuestos, *se confirma la sentencia del Tribunal Superior, Sala de San Juan, en la cual se confirmó la resolución y orden del Comité de Apelaciones de la A.M.A. de suspender al recurrente por un término de treinta (30) días de empleo y sueldo.*

El Juez Asociado Señor Fuster Berlingeri no intervino.