CC-2000-792                    1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pedro J. Muñiz<br>    Peticionario<br><br>              v.<br><br>Administrador del Deporte Hípico<br>    Recurrido | Certiorari<br><br>2002 TSPR 2<br><br>155 DPR _____ |

Número del Caso: CC-2000-792


Fecha: 8/enero/2002


Tribunal de Circuito de Apelaciones:
                        Circuito Regional I


Panel integrado por su Presidente, Juez Arbona Lago y los Jueces Cordero y González Rivera


Abogados de la Parte Peticionaria:
                        Lcdo. Juan M. Rivera González
                        Lcdo. Darcy R. Brum Arrieta


Abogado de la Parte Recurida:
                        Lcdo. Julio A. Marrero Orsini


Abogada de la Junta Hípica:
                        Lcda. Amanda Acevedo Rhodes


Materia: Revisión Administrativa


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro J. Muñiz

    Peticionario

      v.                          CC-2000-792    Certiorari

Administrador del
Deporte Hípico

    Recurrido


Opinión del Tribunal[1] emitida por el Juez Asociado señor FUSTER BERLINGERI.

      San Juan, Puerto Rico, a 8 de enero de 2002.


> "La verdad nada tiene que temer...a menos que se les prive de sus armas naturales: la libre discusión y el debate."
> Tomas Jefferson

     Nos corresponde resolver si el Estado, representado por la Junta Hípica, tenía fundamentos adecuados para prohibirle al dueño de un caballo de carreras que le pusiera a éste el nombre de "PAZPARAVIEQUES".

---

[1] EL JUEZ PRESIDENTE SEÑOR ANDREU GARCIA, EL JUEZ ASOCIADO SEÑOR REBOLLO LOPEZ, LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODON Y EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI, QUE CONSTITUYEN UNA MAYORÍA DEL TRIBUNAL, ESTAN CONFORMES CON TODA LA OPINIÓN EXCEPTO EN LO QUE RESPECTA A SU ACÁPITE V, QUE NO ES SUSCRITO POR LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODON.

I.

Pedro J. Muñiz (Muñiz) adquirió la potranca Reina Blanca 98 y le solicitó permiso al *Jockey Club Registration Service Deparment (Jockey Club)*[2] para inscribirla para carreras hípicas con el nuevo nombre de PAZPARAVIEQUES. El *Jockey Club* así la registró. Oportunamente Muñiz sometió la solicitud correspondiente al Administrador de la Administración de la Industria y el Deporte Hípico (en adelante Administrador), para que también aprobara el nombre en cuestión para su caballo. El 25 de febrero de 2000, dicho Administrador emitió una resolución mediante la cual, al amparo del artículo 1143, inciso *l,* del Reglamento Hípico,[3] Reglamento Núm. 4118 del 29 de enero de 1990, según enmendado por el 5379 del 9 de febrero de 1996, denegó el nombre de PAZPARAVIEQUES para el caballo de Muñiz por entender que era susceptible a considerarse como uno de propaganda.

Rechazada de plano su solicitud de reconsideración por el Administrador, Muñiz procuró la revisión de su dictamen ante la Junta Hípica, por entender que la determinación del Administrador había sido arbitraria y caprichosa. El 27 de abril de 2000, la Junta Hípica a su vez resolvió que el Administrador tenía suficiente discreción para denegar la petición del recurrente. Estableció que quedaba claro que el asunto de este caso trataba de **"un movimiento político partidista, patrocinado por una minoría que quiere imponer su voluntad"**. El Presidente de la Junta Hípica emitió una opinión disidente en la cual expresó que no podía avalar la interpretación de la Junta Hípica del término "propaganda", por lo que entendía que el

---

[2] En 1996, a petición de la Confederación de Dueños de Caballos, la Administración de la Industria y el Deporte Hípico firmó un acuerdo con el *Jockey Club* para incluir a los caballos inscritos en Puerto Rico en el registro conocido como *The American Stud Book*. Según el acuerdo suscrito por las partes, el Administrador Hípico tiene que aprobar los nombres aunque el *Jockey Club* los haya aceptado.

[3] El Artículo 1143 establece, en lo aquí pertinente:
No se aprobarán por el Administrador los siguientes nombres:
[...]
**l. Nombres que se consideren o sean susceptibles a considerarse como de propaganda.**
[...]

referido organismo se había excedido en su discreción. Muñiz solicitó la reconsideración del dictamen referida, la cual fue denegada.

Inconforme con lo resuelto por la Junta Hípica, Muñiz acudió al Tribunal de Circuito de Apelaciones. Alegó allí que, al denegarle el uso del nombre PAZPARAVIEQUES, la Junta Hípica le estaba violando su derecho constitucional a la libre expresión; y que la disposición que le confería poder al Administrador para aprobar nombres de caballos de carrera adolecía de vaguedad y amplitud excesiva. El foro apelativo, mediante una resolución de 21 de agosto de 2000, determinó que PAZPARAVIEQUES diseminaba un mensaje específico respecto a un asunto de gran interés público y político en Puerto Rico y que tanto el Administrador como la Junta Hípica "... **interesan evitar que la Industria y el Deporte Hípico se asocie o se utilice como vehículo propangandístico respecto a un sector en la causa viequense**." El referido tribunal reconoció que "[e]l nombre oficial de un caballo de carreras es objeto de gran repercusión en prensa escrita, radial, publicaciones oficiales del hipódromo y ante la fanaticada hípica", pero estableció que ni la industria ni el deporte hípico habían sido organizados "... para que también sirvieran de foro al intercambio comunitario de ideas", por lo que el nombre del caballo no constituye "... un foro público tradicional respecto a la libertad de expresión como lo pueden ser las carreteras o los parques públicos..." No resolvió, por no entenderlo necesario, los planteamientos en torno a la doctrina de amplitud excesiva y vaguedad. Concluyó que la Junta Hípica había actuado correcta y razonablemente dentro de las facultades conferidas por ley y en protección del interés público, por lo que denegó el auto solicitado.

El 25 de septiembre de 2000 Muñiz acudió ante nos y alegó la comisión del siguiente error:

> Erró el Tribunal de Circuito de Apelaciones al determinar que la Junta Hípica y su Administrador actuaron correcta y razonablemente al denegar al peticionario el nombre PAZPARAVIEQUES por carecer éste de un derecho constitucional a poner dicho nombre a su ejemplar por no tratarse de un foro público tradicional.

En esencia, Muñiz alegó que el hipódromo reunía todos los criterios y características de un foro público tradicional. Adujo, además, que las disposiciones reglamentarias de la Junta Hípica adolecían tanto de vaguedad como de amplitud excesiva.

El 4 de octubre de 2000 expedimos el recurso. Tanto la Junta Hípica como el Administrador comparecieron en oposición y solicitaron la desestimación del recurso. Con el beneficio de la comparecencia de las partes, procedemos a resolver.

II.

Como se sabe, la libertad de expresión está consagrada en la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico en los siguientes términos:

> "No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios."[4]

Esta disposición constitucional abarca "el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de los derechos." Diario de Sesiones de la Convención Constituyente de Puerto Rico, Equity Publishing Corp., 1961, tomo 4, pág. 2564. "Este derecho fue concebido no solamente como una protección de la expresión política, sino también para facilitar el desarrollo pleno del individuo y estimular el libre intercambio y la diversidad de ideas, elementos vitales del proceso democrático." Velázquez Pagán v. A.M.A., 131 D.P.R. 568, 576 (1992). Puesto que se trata de unos derechos a los cuales le hemos reconocido la mayor jerarquía en nuestro ordenamiento constitucional, estamos obligados a su más celosa protección. Empresas Puertorriqueñas de Desarrollo, Inc. v. H.I.E.Tel., 150 D.P.R. ___, 2000 T.S.P.R. 71, 2000 JTS 83. No obstante, "este valor superior no supone una irrestricción absoluta, de forma que no pueda subordinarse

---

[4] Sección 4 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico.

a otros intereses cuando la necesidad y conveniencia pública los requieran." Mari Bras v. Casañas, 96 D.P.R. 15, 21 (1968). Las limitaciones a la libertad de expresión, claro está, serán interpretadas restrictivamente, de manera que no abarquen más de lo imprescindible. Velázquez Pagán v. A.M.A., supra, pág. 577.

Al analizar las controversias que surgen al amparo del derecho a la libertad de expresión, es menester distinguir entre la reglamentación gubernamental del **contenido** de la expresión y la reglamentación del **tiempo, lugar y manera** de la expresión. Como bien ha reconocido el profesor Serrano Geyls en su importante obra Derecho Constitucional de Estados Unidos y Puerto Rico, Vol. II, 1988, pág. 1278, la jurisprudencia ha establecido una diferencia en cuanto al problema de la intervención gubernamental con las libertades de expresión, distinguiendo la intervención con respecto al contenido de la expresión de aquella intervención relativa al tiempo, lugar y manera de la expresión. Véase, además, Rotundo y Novak, Treatise on Constitutional Law, 1999 West Group, Sec. 20.11, pág. 278.

La distinción antes mencionada es muy pertinente al asunto ante nuestra consideración en el caso de autos. El peticionario ha impugnado ante nos el dictamen del foro apelativo de que el hipódromo no es un foro público tradicional en el cual pueda ejercerse la libertad de expresión ampliamente. Muñiz alega que sí lo es. Esta controversia es una relativa al **lugar** de la expresión y por ende para resolverla parecería pertinente referirse a los principios aplicables de derecho constitucional y a nuestra jurisprudencia sobre la reglamentación del **tiempo, lugar y manera** de la expresión.

Sin embargo, no hemos de examinar la controversia referida –ni referirnos a la normativa constitucional sobre la reglamentación del tiempo, lugar y manera de expresión– porque el caso de autos presenta un problema **más fundamental** que el de dicha controversia, relativo a la reglamentación del **contenido** de la expresión.

Cuando se traen ante nuestra consideración casos en los cuales existe una intervención gubernamental con el contenido de la expresión, nos corresponde prioritariamente la función de determinar si la reglamentación impugnada **es neutral o no** en cuanto al contenido de la expresión que se pretende prohibir o restringir, **independientemente del foro donde se haya realizado la expresión.** Se entiende que una medida procura limitar el contenido de una expresión cuando la prohibición va dirigida precisamente a las ideas o a la información que se quiere diseminar, por el mensaje o punto de vista específico de la expresión o por el efecto que esa información o idea pueda tener. Cualquier acción del gobierno de esta naturaleza, que esté dirigida al contenido o al impacto comunicativo de la expresión, **se considera tan ominosa jurídicamente que se presume contraria a la Primera Enmienda de la Constitución federal**, Tribe, *American Constitutional Law*, 2nd Ed., 1988, págs. 789-90, **y a la Sección 4 del Artículo II de nuestra Constitución**, Mari Bras v. Casañas, supra. Como hemos resuelto antes expresamente, ni siquiera en los **foros no públicos** puede la reglamentación gubernamental ser "parte de un esfuerzo para suprimir la expresión", Unión Nacional de Trabajadores de la Salud v. Secretario de Salud, 133 D.P.R. 153, 164 (1993); y como han señalado los conocidos comentaristas Rotunda y Novak, supra, pág. 570, refiriéndose a los límites que la Primera Enmienda impone a las decisiones administrativas, "... the decision to grant or deny a permit may not be based on the content of the message." Para que prevalezca la validez de una disposición de este tipo, quien la defiende tiene el peso de probar que la reglamentación en cuestión es estrictamente necesaria para adelantar un interés apremiante del Estado, o que cae bajo una de las clases de expresiones que no tienen protección constitucional.[5] De otro modo, la reglamentación que incide sobre el contenido de la expresión, y que carece de neutralidad, es inconstitucional, **trátese del foro que sea.**

---

[5] **Entre las clases de expresiones no protegidas se encuentran: la expresión política que crea un peligro claro y presente de subversión ("mensaje subversivo"), las palabras de riña, la obscenidad y la difamación. Véase Serrano Geyls, supra.**

El eminente constitucionalista norteamericano L. Tribe ha expresado con claridad la normativa aplicable a los casos que tratan sobre una intervención gubernamental con el **contenido** de la expresión, en su obra *American Constitutional Law*, supra, págs. 987-988 y 992-993:

…When the government clearly takes aim at a disfavored message, as on [regulations aimed at communicative impact], **it makes no difference where the speech occurs** or even what means, verbal or nonverbal, the speaker uses to communicate it. **In cases such as these, public forum classifications are unnecessary and unhelpful.** It is only when the law does not regulate the content of messages as such, and when there is no evidence of a governmental motive to discriminate in favor of or against a particular viewpoint, that the Court properly inquires into such factors as the place of the speech, the character of the particular activity being regulated, and the nature of the restriction imposed.

[…]

As this overview of the cases strongly suggests, **whether or not a given place is deemed a "public forum" is ordinarily less significant than the nature of the speech restriction**-despite the Court's rethoric. Indeed, even the rethoric at times reveals as much. Thus, the Court has said that speech within public forums may not ordinarily be abridged unless the regulation is content neutral, serves a significant governmental interest and leaves open adequate alternative channels for communication. **But even where property does *not* constitute a public forum, the Court has said that government regulation must ordinarily be content neutral,** and must still be reasonable as to time, place, and manner. …

Beyond confusing the issues, an excessive focus on the public character of some forums, coupled with inadequate attention to the precise details of the restrictions on expression, can leave speech inadequately protected in some cases, while unduly hampering state and local authorities in others. … (Citas omitidas) (Énfasis suplido)

**Resulta claramente de lo anterior que el intento gubernamental de regular el ejercicio de la libertad de expresión, sea cual sea el foro donde la persona afectada quiera expresarse, sólo es lícito si dicha reglamentación es** neutral **en cuanto al contenido de la expresión.**

**Reseñado brevemente el conocido derecho aplicable, pasamos a analizar la controversia concreta ante nos.**

### III.

En el caso de autos, no cabe duda de que Muñiz, al nombrar a su caballo PAZPARAVIEQUES, tenía la clara intención de comunicar un mensaje y de

intervenir en esa forma en el candente debate de un asunto público de la mayor importancia para los puertorriqueños. Como bien señaló el propio Administrador Hípico en su comparecencia, "... el nombre está rodeado de un gran contenido emocional, ideológico y político...", y el Tribunal de Circuito de Apelaciones en su resolución, "... puede considerarse válidamente que PAZPARAVIEQUES comprende o enuncia un mensaje específico respecto a un asunto de alto interés público y político en Puerto Rico, sobre el cual existen varios puntos de vista, algunos matizados por gran influencia político partidista."

Es precisamente para permitirle a personas como Muñiz participar en la discusión de los asuntos colectivos que existe la libertad de expresión. Esta les garantiza que puedan ser oídos y que puedan propagar sus ideas sobre el particular. Mari Brás v. Casañas, supra. Al nombrar su caballo "PAZPARAVIEQUES" Muñiz intentó hacer ejercicio de su libertad de expresión. Se trata obviamente de una expresión protegida, ya que es una expresión política legítima que claramente no cae bajo ninguna de las categorías de expresión referidas antes que carecen de protección constitucional.

Es evidente, además, que la acción del Administrador Hípico avalada por la Junta Hípica, de prohibirle a Muñiz nombrar a su caballo "PAZPARAVIEQUES" constituyó una intervención gubernamental relativa al **contenido** de la expresión de Muñiz. Se le prohibió darle el nombre referido a su caballo precisamente para impedir que Muñiz difundiese el mensaje que quería comunicar mediante dicho nombre. Tanto la prohibición del funcionario gubernamental como la de la agencia estatal iban dirigidas claramente contra la idea en sí que Muñiz quería expresar al nombrar su caballo del modo referido.

Asimismo es evidente, además, que tal intervención gubernamental con el contenido de la expresión **no era neutral**. Como bien señaló el foro apelativo en su sentencia en el caso de autos, el Administrador y la Junta Hípica aquí interesaban "evitar que la industria y el deporte hípico se asocie o se utilice como vehículo propagandístico respecto **a un sector de**

**la causa viequense".** (Énfasis suplido) La propia Junta Hípica también expresó su desaprobación del mensaje en sí que se comunicaba mediante el nombre del caballo en cuestión al afirmar que estaba involucrado en esto **"un movimiento político partidista, patrocinado por una minoría que quiere imponer su voluntad."** Resulta claro, por lo tanto, que la prohibición del mensaje de Muñiz surgía de una postura valorativa del Administrador y la Junta Hípica **en contra** de dicho mensaje. No estaban de acuerdo con el mensaje referido; no tenían una postura neutral con respecto a éste.

A la luz de lo anterior, queda claro también que en el caso de autos la prohibición gubernamental del uso del nombre "PAZPARAVIEQUES" para un caballo de carreras en el hipódromo no respondió estrictamente a la necesidad de proteger un interés público apremiante. El Administrador y la Junta Hípica intentaron justificar su actuación alegando que el Reglamento Hípico, en su sección XI, dispone que al nombrar caballos no se podrán utilizar **"nombres que se consideren o sean susceptibles a considerarse como de propaganda".** Según la Junta Hípica, conforme a esta disposición reglamentaria, el Administrador viene obligado a prohibir los nombres de caballos que puedan ser sugestivos de propaganda, que puedan crear la impresión de que no responden a intereses hípicos, o hacer sospechar al apostador que puede haber algún interés ulterior involucrado en el resultado de una carrera. Alegó la Junta Hípica que el Administrador había actuado para hacer valer la reglamentación referida, dentro de la discreción administrativa que tiene para ello.

La explicación referida ofrecida por los recurridos no satisface de ningún modo los requisitos constitucionales antes mencionados que exigen que una intervención gubernamental con respecto al contenido de una expresión protegida sea neutral o estrictamente necesaria para atender un interés estatal apremiante. Nótese, por un lado, que es altamente cuestionable que la disposición reglamentaria invocada por la Junta Hípica aquí responda a la necesidad de proteger un interés público de la más alta jerarquía. Asumiendo que el interés público que informa dicha disposición

sea el logro de la integridad y confiabilidad de la industria hípica, tal interés, que es de naturaleza económica y relativo a un negocio privado, no tiene la alta prioridad social de los intereses **apremiantes** del Estado.[6]

Más importante aun, la determinación del Administrador y de la Junta Hípica de prohibir el nombre del caballo en cuestión, para suprimir así el contenido del mensaje que dicho nombre expresaba, constituyó, por admisión propia de dicha Junta, una desaprobación de dicho mensaje por razón de su contenido **político**. Ello representa un discrimen por razón de ideas políticas, que está clara y tajantemente prohibido por nuestra Constitución, que en su Art. II, Sección I dispone, en lo pertinente que: "no podrá establecerse discrimen alguno por motivo de . . .ideas políticas. . ." Que se trata de una acción discriminatoria surge, además, de modo palmario si se considera que, según aparece en el expediente del caso de autos, el Administrador **ya había aprobado otros nombres de caballos de claro contenido político**, tales como "Sangre Azul", "Paso Palma", "Estrella Dorada", "Tren Urbano", "El Amolao", "Pedro R." y "Carlos R.". La acción impugnada ante nos, pues, no responde de modo alguno a un interés apremiante del Estado sino más bien a una postura estatal que discrimina en contra de determinadas ideas políticas, lo que es a todas luces impermisible e inconstitucional. Véase, Good News Club v. Miford Central, 69 U.S.L.W. 4451 (2001).

Para recapitular, no resolvemos aquí si el hipódromo es o no es un foro público tradicional para el ejercicio del derecho de expresión. Tampoco resolvemos si la Junta Hípica puede o no formular un Reglamento válido para

---

[6] Con respecto a la reglamentación económica, el Estado tiene una amplia facultad, que no apareja la limitación a la que se alude cuando se requiere que una reglamentación estatal responda a intereses públicos apremiantes. Véase Marina Ind., Inc. v. Brown Boveri Corp., 114 D.P.R. 64 (1983).

Mas aun, el interés público que informa la reglamentación que aquí nos concierne no es comparable a aquellos que hemos reconocido como intereses apremiantes del Estado, tales como la protección y la promoción del bienestar de los menores de edad (Pérez Vega v. Procurador, res. el 27 de abril de 1999, 148 D.P.R. ___, 99 T.S.P.R. 64, 99 JTS 70); que las instituciones educativas del país ofrezcan servicios de calidad (Asoc. Academias y Col. Cristianos v. E.L.A., 135 D.P.R. 150, 164 (1994)); la confidencialidad de determinadas investigaciones gubernamentales (Ortiz Rivera v. Bauermeister, res. el 29 de septiembre de 2000, 152 D.P.R. ___, 2000 T.S.P.R. 145, 2000 JTS 157) y otros. Véase Fulana de Tal v. Demandado A, 138 D.P.R. 610, 620 (1995).

preceptuar lo relativo a los nombres que pueden tener los caballos de carreras hípicas. Sólo resolvemos que la acción estatal tanto del Administrador como de la Junta Hípica en el caso de autos, de negarle a Muñiz el uso del nombre **"PAZPARAVIEQUES"** para un caballo suyo, es inconstitucional por ser una reglamentación discriminatoria del contenido de una expresión.


IV.

Debemos afirmar una vez más que la libertad de expresión protege incluso los mensajes controversiales, las ideas que muchos no comparten, y hasta las manifestaciones que algunos estimen reprochables.  El gran Juez Douglas del Tribunal Supremo de Estados Unidos expresó con claridad y elocuencia este aspecto esencial de la libertad de expresión, en <u>Terminiello v. Chicago</u>, 337 U.S. 1 (1949):

> [A] function of free speech. . . is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.  Speech is often provocative and challenging.  It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. . . the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

No pueden los funcionarios públicos suprimir la expresión de alguna persona sólo porque no la comparten o les disgusta; tampoco pueden suprimirla sólo porque los que se oponen a tal expresión no hayan manifestado su propio mensaje; mucho menos pueden hacerlo porque consideran que tal expresión es un punto de vista minoritario. Permitir que el Estado pueda prohibir la divulgación de un mensaje por cualquiera de esas razones equivaldría a la muerte de la libertad de expresión.

Erraron el Administrador y la Junta Hípica al prohibirle a Muñiz nombrar su caballo "PAZPARAVIEQUES"; erró el Tribunal de Circuito de Apelaciones al validar tal decisión administrativa.


V.

Existe otro fundamento importante para nuestro dictamen en el párrafo anterior sobre la invalidez de la decisión de prohibirle al peticionario nombrar su caballo PAZPARAVIEQUES, y es que la disposición reglamentaria invocada por el Administrador y la Junta Hípica en apoyo de tal decisión es inconstitucional debido a que esa disposición es defectuosa por su vaguedad. El Reglamento Hípico no define qué es "propaganda". Tampoco provee criterios que sirvan de guía para delimitar la discreción administrativa. Los nombres de caballos para el deporte hípico, por su propia naturaleza, de alguna forma u otra comunican alguna idea, sea comercial, política o de otra índole. Por ello, la vaga referencia reglamentaria a que el nombre del caballo no sea "susceptible de propaganda" deja la puerta abierta a que el Administrador aplique la norma selectivamente, y por ende, arbitrariamente. No cabe dudas de que por esta razón se trata de una disposición constitucional defectuosa, por vaguedad. Véase, Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229, 238-239 (1988).

## VI.

Por los fundamentos expuestos, se revoca la resolución del Tribunal de Circuito de Apelaciones de 21 de agosto de 2000 y la resolución de la Junta Hípica de 27 de abril de 2000, y se ordena que se inscriba la potranca Reina Blanca 98 propiedad de Muñiz con el nombre de PAZPARAVIEQUES.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

CC-2000-792                    14

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro J. Muñiz

    Peticionario

      v.                          CC-2000-792    Certiorari

Administrador del
Deporte Hípico

    Recurrido


SENTENCIA

San Juan, Puerto Rico, a 8 de enero de 2002.


    Por las razones expuestas en la Opinión que antecede, la cual se hace formar parte de la presente sentencia, se revoca la resolución del Tribunal de Circuito de Apelaciones de 21 de agosto de 2000, la resolución de la Junta Hípica de 27 de abril de 2000, y el dictamen del Administrador del Deporte Hípico del 25 de febrero de 2000 con respecto al caso de autos. Asimismo, se ordena que se inscriba la potranca Reina Blanca 98 propiedad de Muñiz con el nombre de PAZPARAVIEQUES.

    Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo Interina.  El Juez Asociado señor Hernández Denton emitió una opinión concurrente. El Juez Asociado señor Corrada del Río emitió una opinión disidente.

    El Juez Asociado señor Rivera Pérez disiente por entender que la posición mayoritaria convierte la celebración de las carreras de caballos, como parte del deporte hípico en Puerto Rico, en un foro público, al permitir que expresiones exógenas al mismo se puedan producir durante la celebración de las referidas carreras; concluye que dicho curso decisorio lesiona y perjudica sustancialmente el carácter deportivo y económico de dicha actividad y expone a

los aficionados y fanáticos del deporte hípico involuntariamente a esas expresiones, limitando irrazonablemente su libre albedrío.


Carmen E. Cruz Rivera
Secretaria del Tribunal Supremo Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro J. Muñiz

  Peticionario

  v.                                    CC-2000-792      Certiorari

Administrador del Deporte
Hípico

  Recurrido

Opinión Concurrente emitida por el Juez Asociado señor Hernández Denton

San Juan, Puerto Rico, a 8 de enero de 2002.

A pesar de que el presente recurso trata sobre un ejemplar cuyo cambio de nombre es más conocido por la controversia en el caso de autos que por sus ejecutorias hípicas, hemos decidido expresarnos de manera particular, por entender que a este caso no le corresponde la dimensión que se le ha dado. Además, hubiésemos preferido que la presente controversia se resolviera mediante Sentencia, que es la manera más apropiada para resolver asuntos de esta naturaleza.

No obstante, concurrimos con la conclusión de la Opinión del Tribunal en cuanto a que el Administrador del Deporte Hípico ("el Administrador") erró al prohibir que se cambie el

**nombre del ejemplar Reina Blanca 98 por PAZPARAVIEQUES. Empero, consideramos que la doctrina de vaguedad y amplitud excesiva dispone del asunto que se nos plantea de una manera más efectiva y precisa que el curso de acción adoptado por la Opinión del Tribunal; y que no eran necesarios los pronunciamientos vertidos en las partes II, III y IV de la Opinión suscrita por la mayoría de los compañeros Jueces.**

I

Al examinar los estatutos que limitan la libertad de expresión en cuanto al contenido, los tribunales han desarrollado las doctrinas de vaguedad y amplitud excesiva. Véase R. Serrano Geyls, <u>Derecho Constitucional de Estados Unidos y Puerto Rico</u>, 1era ed., San Juan, Ed. Col. Abog. P.R., 1988, Vol. II, págs. 1319-1324. Una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. Para prevenir que las leyes sean aplicadas de manera arbitraria y discriminatoria, éstas deben proveer normas claras para aquellas personas encargadas de ponerlas en vigor. Una ley adolece de vaguedad si una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende penalizar, y se presta a la aplicación arbitraria y discriminatoria. <u>Vives Vázquez v. Tribunal Superior</u>, 101 D.P.R. 139, 145-146 (1973); <u>Velázquez Pagán v. A.M.A.</u>, 131 D.P.R. 568, 577 (1992); <u>U.N.T.S. v. Srio. de Salud</u>, 133 D.P.R. 153, 161 (1993).

Por otro lado, una reglamentación adolece de amplitud excesiva cuando aspira a prohibir o castigar expresiones que no gozan de la protección constitucional pero que por razón de haber sido redactada o interpretada imprecisamente tiene el efecto de prohibir o castigar expresiones constitucionalmente protegidas. El problema básico es que la ley excesivamente amplia desalienta la expresión protegida por la Constitución porque los encargados de ponerla en vigor tienen entonces demasiada discreción y pueden usar la ley para proscribir expresiones constitucionalmente válidas. Serrano Geyls, op. cit., pág. 1320. Véase,

además: <u>Velázquez Pagán v. A.M.A.</u>, *supra*;  <u>U.N.T.S. v. Srio. de Salud</u>, *supra*.

                                    II

Examinada brevemente la normativa prevaleciente a utilizarse para examinar una legislación o reglamentación que limita la libertad de expresión, procede analizar la validez del Reglamento Núm. 4118 del 29 de enero de 1990, según enmendado, ("el Reglamento") que utiliza el Administrador al pasar juicio sobre los nombres de ejemplares que se someten para su aprobación.

La disposición reglamentaria en controversia adolece de vaguedad porque no define qué es propaganda, ni ofrece criterio alguno de cómo debe aplicarse o interpretarse su texto.  Así, la referida disposición promueve su aplicación de manera arbitraria y discriminatoria al concederle discreción absoluta al Administrador para determinar los elementos para su aplicación.

A pesar de que el Administrador ha aprobado nombres de ejemplares como Pedro R., Carlos R., El Amolao y Tren Urbano, en este caso consideró que PAZPARAVIEQUES es un término que sirve de propaganda para un movimiento político-partidista. Por ende, denegó el cambio de nombre solicitado por el señor Pedro J. Muñiz. Las decisiones de la Junta Hípica y el Tribunal de Circuito de Apelaciones confirmando dicha resolución, se fundamentaron esencialmente en el grado de discreción que el Reglamento le confiere al Administrador para aprobar los nombres de los ejemplares. Es claro que desde ese punto de vista, cualquier decisión del Administrador será avalada ya que el Reglamento le confiere absoluta discreción y le permite justificar sus decisiones con los criterios que le sean más convenientes.

Lo anterior queda evidenciado de forma patente con el hecho de que al mismo dueño de PAZPARAVIEQUES, el Administrador le aprobó el nombre de "ISLA NENA SINNEIVI" para otro ejemplar de su establo, el cual sí ha tenido éxito

en sus ejecutorias hípicas.[7] Esto demuestra la arbitrariedad en la aplicación del Reglamento a causa de su redacción vaga e imprecisa.

De igual forma, la disposición reglamentaria ante nuestra consideración sufre del defecto de ser excesivamente amplia. Esto es así, porque, aunque reconocemos que existen situaciones en que el Administrador podría validamente denegar ciertos nombres de ejemplares, el Reglamento alcanza a prohibir expresión protegida por la Constitución. Su redacción imprecisa permite que se interprete y aplique para prohibir expresión que al amparo de nuestra constitución no podría legítimamente prohibirse, como ocurrió en este caso.

Finalmente, consideramos que en el caso de marras no era necesario analizar el interés del estado para aprobar el Reglamento, ni la naturaleza de los motivos de la Junta Hípica y su Administrador para denegar la solicitud del cambio de nombre de Reina Blanca 98 a PAZPARAVIEQUES. Aun concluyendo que existe un motivo adecuado que justifique la aprobación del Reglamento y que la Junta no actuó discriminatoriamente, tenemos que necesariamente concluir que la disposición reglamentaria en discusión es nula por adolecer de vaguedad y amplitud excesiva. A pesar de esto, este Tribunal optó por fijar pautas en cuanto a nuestro derecho de libertad de expresión que no eran necesarias. Por ende, concurrimos.


                              Federico Hernández Denton
                              Juez Asociado

---

[7] Tomamos conocimiento judicial de que "ISLA NENA SINNEIVI" arribó en primer lugar en la quinta carrera del lunes 29 de octubre de 2001. El Vocero, 30 de octubre de 2001, pág. 66.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro J. Muñiz

     Peticionario

       v.
                            CC-2000-792

**Administrador del**

**Deporte Hípico**


      **Recurrido**

**Opinión Disidente emitida por el Juez Asociado señor CORRADA DEL RÍO**

**San Juan, Puerto Rico a 8 de enero de 2002.**

**I**

**En el presente caso, la Mayoría de este Tribunal entiende que el artículo 1143, inciso *l*, del Reglamento Hípico, Reglamento Núm. 4118 del 29 de enero de 1990, según enmendado por el 5379 del 9 de febrero de 1996, viola el ejercicio de la libertad de expresión, protegido por la Primera Enmienda de la Constitución de los Estados Unidos y por la Sección 4 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico. Entendemos, que el presente caso debió resolverse mediante las doctrinas de vaguedad y amplitud**

excesiva, como señala el Juez Asociado señor Hernández

Denton en

su Opinión Concurrente.[8] Disentimos por entender que bajo los hechos del caso de autos no se justifica la aplicación de los principios constitucionales esbozados en los acápites II, III y IV de la Opinión Mayoritaria.

Anteriormente hemos expresado que, ante las alegaciones de que un estatuto o reglamento limita el ejercicio a la libre expresión, los tribunales han distinguido entre la reglamentación del contenido y la de tiempo, lugar y manera. Véase, *Velásquez Pagán v. A.M.A.*, 131 D.P.R. 568 (1992). En cuanto al contenido, debemos atender primero si el estatuto o reglamento adolece de vaguedad o amplitud excesiva. *Íd.* Las doctrinas de vaguedad y amplitud excesiva han sido desarrolladas con el propósito de evaluar la constitucionalidad de una ley o reglamento sin la necesidad de pasar juicio sobre la sabiduría y propósitos del legislador o de la institución que promulgó el reglamento. Bajo estas doctrinas, se analiza o evalúa la disposición concernida de su faz, por lo que resulta innecesario evaluar si la aprobación de la misma responde a un interés apremiante del Estado. *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153, 160 (1993). Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1era ed., San Juan, Ed. Col. Abog. P.R., 1988, Vol. II, págs. 1319-1324.

Entendemos que debió aplicarse las doctrinas de vaguedad y amplitud excesiva, ya que el reglamento en cuestión no define claramente el término propaganda y promueve que la misma sea aplicada de forma arbitraria y discriminatoria. Además, su redacción imprecisa podría tener el alcance de prohibir expresiones constitucionalmente protegidas.

II

El derecho a la libertad de expresión protege y garantiza el flujo de ideas y las diversas expresiones y manifestaciones del pensamiento. Bajo la libertad de expresión se garantiza, además, la independencia de criterios y la expresión de posturas contrarias a ideas diseminadas.

---

[8] Aun cuando en el acápite V de la Opinión Mayoritaria se concluye que la reglamentación concernida adolece de vaguedad, no constituye éste el *ratio decidendi* de la Opinión. La Mayoría de este Tribunal fundamenta su Opinión en principios constitucionales sobre libertad de expresión cuya aplicación resultan innecesarias a los hechos del caso de autos. Entendemos que dentro de nuestro acervo jurídico, las normas concernidas deben ser aplicadas una vez la reglamentación en cuestión supere el problema de vaguedad y amplitud excesiva.

Coincidimos con el criterio de que cuando una ley o reglamento limita el contenido de una expresión, se presume que es inconstitucional, y que a aquel que alegue la constitucionalidad de la misma, le corresponde probar que la disposición concernida es estrictamente necesaria para adelantar un interés apremiante del Estado. Sin embargo, la Mayoría de este Tribunal, al aplicar los conceptos antes indicados no considera la naturaleza del foro donde se reglamenta la expresión, dando la impresión que dicho análisis es irrelevante en casos como el de autos.

En *Greer v. Spock*, 424 U.S. 828 (1976) y en *Lehman v. Shaker Heights*, 418 U.S. 298 (1974), el Tribunal Supremo de los Estados Unidos reconoció que el Gobierno puede prohibir el contenido de una expresión dentro de sus facilidades, cuando ésta interfiere con los propósitos para los cuales ha sido destinada la propiedad gubernamental o la actividad reglamentada.[9] Véase, *Consolidated Edison Co. v. Public Service Com.*, 447 U.S. 530, 538 (1980).[10] En *Greer, supra*, se prohibió mediante reglamento, *inter alia*, protestas, manifestaciones políticas y actividades similares dentro de una base militar.[11] Varios candidatos a puestos electivos informaron al oficial a cargo de la instalación militar sus intenciones de entrar a las inmediaciones de la base con el propósito de repartir propaganda política y reunirse con personal de la base con el propósito de discutir asuntos relacionados con las elecciones. La realización de las actividades antes indicadas les fue negada. Los candidatos alegaron que el reglamento restringía su libertad de expresión. Aun cuando la reglamentación limitaba el contenido de la expresión, el Tribunal Supremo de los Estados Unidos

---

[9] En el caso de autos las facilidades del hipódromo no pertenecen al Estado. Las facilidades concernidas pertenecen a una entidad privada, quien tiene la obligación de operar conforme a los términos y condiciones establecidos por la Junta Hípica para la concesión de la autorización o licencia correspondiente. Ley Núm. 83 de 2 de julio de 1987, 15 L.P.R.A. secs. 198b(30) & 198e(b)(1), conocida como la Ley de la Industria y el Deporte Hípico de Puerto Rico.

[10] En *Consolidated Edison, supra*, la Comisión de Servicio Público del estado de Nueva York prohibió que se utilizaran las facturas emitidas por las compañías de utilidades para discutir asuntos de política pública. El Tribunal Supremo de los Estados Unidos entendió que la prohibición concernida estaba en contra de la Primera Enmienda de la Constitución de los Estados Unidos, ya que contrario al caso de autos, los abonados podían evadir la información presentada con meramente echar al recipiente de la basura la comunicación recibida.

[11] Cabe destacar que en dicha base se permitía el libre acceso de ciudadanos a ciertas áreas, las cuales fueron el centro de la controversia.

sostuvo la constitucionalidad del reglamento luego de examinar la naturaleza del foro y los propósitos para los cuales éste fue promulgado.

En *Lehman, supra*, la ciudad de Shaker Heights en Ohio, prohibió la diseminación de propaganda política en los espacios de anuncios en los vehículos de transportación pública. Luego de analizar la naturaleza del foro y el propósito del mismo, el Tribunal Supremo de los Estados Unidos sostuvo la constitucionalidad de la medida. Consideró, además, que las personas que usaban el sistema de transportación constituían una audiencia cautiva, ya que al éstos utilizar dicho sistema estaban obligatoriamente expuestos a los mensajes o propaganda exhibida. Así, en *Lehman, supra*, pág. 304, el Tribunal Supremo de los Estados Unidos concluyó lo siguiente:

> *Users would be subjected to the blare of political propaganda. There could be lurking doubts about favoritism, and sticky administrative problems might arise in parceling out limited space to eager politicians. In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation. Were we to hold the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.*
>
> *No First Amendment forum is here to be found. The city consciously has limited access to its transit system advertising space in order to minimize changes of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. . . .*

Como parte del derecho a la libre expresión, todo individuo debe tener la libertad para decidir qué mensaje o expresión ha de escuchar o ver, y la manera en que habrá de reaccionar al mismo. El derecho de todo individuo a exteriorizar el contenido de su conciencia es consustancial al derecho de todo individuo a elegir el tipo de expresión a la cual se ha de exponer. Someter un individuo a la manifestación de ideas que no comparte sin opción alguna para evadir la exposición a las mismas, atenta en contra de la esencia de la libertad de expresión.

La Ley Núm. 83 de 2 de julio de 1987, 15 L.P.R.A. sec 198 *et seq.*, conocida como la Ley de la Industria y el Deporte Hípico de Puerto Rico (en lo sucesivo Ley Hípica), confirió a la Junta Hípica la facultad de aprobar el Reglamento

objeto de este pleito.  Conforme a la Ley Hípica, el Deporte Hípico es una actividad híbrida, es decir, la misma es, simultáneamente, de carácter deportivo y económico.  Exposición de Motivos de la Ley Hípica.  El propósito primordial de la Ley Hípica es garantizar la limpieza y confiabilidad del deporte.  *Íd*.

Al aprobar el Reglamento Hípico, la Junta Hípica debe recoger el espíritu que permea la Ley Hípica.  Es decir, el Reglamento Hípico debe garantizar la limpieza y confiabilidad del deporte.

Entendemos que un reglamento como el aquí concernido, el cual prohíbe que se utilice una propaganda política como el nombre de un caballo de carreras sería válido, siempre y cuando no adolezca de vaguedad ni amplitud excesiva.  En el caso de autos, estamos ante una actividad altamente regulada de índole deportiva y económica, en la cual el Estado tiene un interés apremiante por mantener la limpieza y confiabilidad de la misma.  Los hipódromos, foros en los cuales se desarrolla dicha actividad, tienen el propósito de promover el deporte hípico y fomentar la economía mediante las apuestas que se realizan y la creación de empleos.  Estos foros no han sido creados con el propósito de diseminar ideas políticas o de otra índole.

Es nuestro criterio que el público que acude a las actividades hípicas constituye una audiencia cautiva.  El fanático hípico está obligado a enterarse del nombre de los caballos para efectuar su apuesta; está sujeto a escuchar la narración de la carrera en la cual repetidamente se nombran los caballos.  El material hípico lleva impreso el nombre de los equinos.  Por tanto, en una carrera en la cual participe un ejemplar cuyo nombre constituya propaganda política, el fanático está obligado a escucharla o leerla aun cuando no comparta dicha expresión; de lo contrario no podrá enterarse del desarrollo de la carrera o de los caballos que compiten en la misma.

No debemos perder de perspectiva que es un interés legítimo del Estado que el deporte hípico sea limpio y confiable, y que así lo preceptúen los seguidores del mismo.[12]  El permitir la utilización de propaganda política mediante el

---

[12] Además, es la Junta Hípica quien requiere que se dé un nombre al caballo para conceder la licencia para participar en las carreras.  No creemos que al redactar la cláusula que garantiza la libertad de expresión los Padres de la Constitución se sintieran inquietados por el nombre de un ejemplar de carreras.

nombre de un ejemplar de carreras, puede dar la impresión de que la actividad promueve o responde a intereses no relacionados con el deporte.[13]

Por las razones que anteceden, entendemos que una disposición reglamentaria prohibiendo el que se utilice expresiones que se consideren o sean susceptibles de considerarse como propaganda política para nombrar a un ejemplar de carreras, no infringe las garantías de libertad

---

[13] Bastante politización tenemos en Puerto Rico en tantos aspectos de nuestras vidas, donde a todo se le pretende dar una connotación política, inclusive los colores con que se viste, como para echar más flama a este exagerado fenómeno. De permitirse el uso de propaganda en el nombre de los equinos, como lo estamos permitiendo en este caso, no sería sorprendente que en años electorales veamos a dueños de los purasangres nombrando sus animales según su preferencia política. De ahí nombres como Arriba Sila, Pesqueraesel quees, Estoy Con Rubén, o, sus contrapartes, Silanova, Pesquera No Pesca y Abajo Rubén podrían proliferar y agobiar de política al fanático hípico que lo que interesa es disfrutar de las carreras y hacer su apuesta basado en los méritos del corcel y no en la afiliación política de su dueño o su irritante nombre.

de expresión, siempre y cuando no adolezca de vaguedad ni de amplitud excesiva.


                              BALTASAR CORRADA DEL RÍO
                                   JUEZ ASOCIADO