Opinión concurrente y disidente emitida por la
Juez Aso-ciada Señora Rodríguez Rodríguez.
Nos corresponde determinar la constitucionalidad de una ley que impone a una parte la obligación de contribuir a una campaña publicitaria que es contraria a sus intere-ses económicos. Por entender que el asunto ante nuestra consideración versa sobre libertad de expresión en su va-riante de expresión compelida, concurro con el resultado pero disiento enérgicamente de sus fundamentos. Entiendo que se equivoca la mayoría de este Tribunal al disponer de la controversia afirmando que la ley en cuestión es incons- *86 titucional por violar la cláusula de comercio de Estados Unidos en su estado durmiente. Veamos.
I
El Estado Libre Asociado, a través del Secretario de Hacienda, instó una acción en cobro de dinero contra Northwestern Selecta, Inc. Indicó que la parte demandada era un importador de carne de res y como tal estaba obligado por la Ley Núm. 95 de 1992, infra (Ley Núm. 95). Dicha ley establecía que los importadores de carne debían satisfacer la suma de 1$ por cada libra de carne importada mientras que los productores pagarían $4.14 por res sacrificada en matadero y $1.00 por ternero sacrificado en matadero. La contribución estaba destinada al Fondo para el Fomento de la Industria de la Carne de Res, un fondo especial que ten-dría a cargo la promoción de dicha industria. En este sen-tido el Estado adujo, en síntesis, que Northwestern Se-lecta, Inc. no había cumplido con dicha obligación y que, por lo tanto, le debía $301,526.28 en aportaciones vencidas y no pagadas.
Por otra parte, Northwestern Selecta argumentó, entre otras cosas, que la aportación exigida por la Ley Núm. 95, infra, era inconstitucional en su aplicación, ya que violaba su derecho a libertad de expresión y a la libre asociación. Sostuvo que dicha disposición le obligaba solventar una campaña publicitaria contraria a sus intereses económicos, dado que ésta estaba dirigida, según se alegó, a promocio-nar únicamente la carne de res del País.
Luego de varios incidentes procesales, el Tribunal de Primera Instancia sostuvo que la Ley Núm. 95, infra, era constitucional de su faz y en su aplicación. Expresó que el hecho de que se destinara una porción de los dineros recau-dados a una campaña de publicidad de la carne de Res del País no intervenía de forma irrazonable con el derecho a la libertad de expresión y asociación del demandado. En con- *87 secuencia, declaró “con lugar” la demanda en cobro de dinero y ordenó a la peticionaria pagar la suma adeudada más los intereses legales desde la fecha de la Sentencia.
Inconforme, la peticionaria acudió al Tribunal de Apelaciones. Allí expresó básicamente lo mismo que ante el foro primario. Sostuvo que la Ley Núm. 95, infra, le obli-gaba a difundir el mensaje comercial de su competencia y que, por lo tanto, no procedía el cobro de dinero. Sin embargo, planteó por vez primera que la mencionada ley con-travenía la cláusula de comercio interestatal de la Consti-tución de Estados Unidos, dado que tenía el efecto de discriminar contra los importadores de carne de res. El Tribunal de Apelaciones confirmó la Sentencia apelada.
Como cuestión de umbral debo señalar que el plantea-miento de la peticionaria en cuanto a que la Ley Núm. 95 viola la cláusula de comercio de la Constitución de Estados Unidos en su estado durmiente se trajo por primera vez en la apelación presentada ante el Tribunal de Apelaciones. Es por ello que el foro intermedio se rehusó a considerarlo en la etapa apelativa.
No conteste con la determinación del foro a quo, recurren ante este Tribunal. ([1])
*88 Luego de analizado el esquema establecido por la Ley Núm. 95, infra, entiendo, a diferencia del criterio mayori-tario, que el mismo viola el derecho a la libre expresión de la peticionaria y no la cláusula de comercio de la Constitu-ción de Estados Unidos en su estado durmiente; asunto que no está válidamente ante nuestra consideración. Pase-mos a ver.
II
A
La Ley Núm. 95 de 29 de noviembre de 1992, Ley para Crear la Oficina de la Reglamentación y Promoción de la Industria de la Carne de Res; para crear el Fondo para la Industria de la Carne de Res, la Junta Administrativa y establecer sus facultades, e imponer violaciones a esta ley, 5 L.P.R.A. sees. 3001-3012 (Ley Núm. 95), se promulgó para promover la industria de la carne de res en nuestro País. Esto es así dada la importancia de dicha carne en la dieta de la ciudadanía. La legislación tenía como norte be-neficiar a los productores e importadores por lo cual se buscó expandir el mercado a través de la promoción de su consumo. Véase Exposición de Motivos de la Ley Núm. 95 (1992 (Parte 1) Leyes de Puerto Rico 615).
Así las cosas se crearon la Oficina para la Reglamenta-ción y Promoción de la Industria de la Carne de Res (Ofi-cina) y el Fondo para el Fomento de la Industria de la Carne de Res (Fondo). La Oficina tendría como fin promo-ver el consumo, la producción, el mercadeo de la carne de res producida localmente como la importada y ofrecer ase-soramiento técnico a importadores y productores. La Ofi-cina recibiría el 10% de los dineros recaudados por el Fondo para así operar y cumplir con sus fines y propósitos. 5 L.P.R.A. sees. 3002-3003.
*89 Por otro lado, el Fondo se utilizaría para la promoción de la producción, venta, elaboración y consumo de la carne de res tanto la importada como la producida en el País. Para su operación se requeriría que tanto los productores como los importadores aportaran al mismo. Así, los impor-tadores pagarían un centavo (10) por libra de carne de res importada y los productores pagarían cuatro dólares con catorce centavos ($4.14) y un dólar ($1) por res y ternero sacrificado en matadero, respectivamente. 5 L.P.R.A. see. 3008. El encargado del matadero estaría a cargo de cobrar la aportación y debería remitirla al Secretario de Hacienda dentro de un tiempo determinado. En cuanto a los impor-tadores se facultó al Secretario de Hacienda a cobrar las aportaciones.
La Ley Núm. 95 se hizo efectiva 60 días después de su aprobación y estuvo vigente hasta el 1 de enero de 1997, momento en que entró en vigor la Ley Núm. 238 de 18 de septiembre de 1997, Ley para el Ordenamiento de las In-dustrias Agropecuarias de Puerto Rico (Ley Núm. 238). 5 L.P.R.A. sees. 3051-3061. Su finalidad no era otra que crear un nuevo ordenamiento administrativo que permi-tiera regular el sector agropecuario. Asimismo dispuso que cada sector o grupo de sectores debería crear un fondo para promover el desarrollo y comercialización de sus productos. El fondo estaría alimentado por las aportaciones de cada sector o grupo de sectores que lo compusiese, determinados por la junta administrativa. Además, en lo que a esta con-troversia respecta la Ley Núm. 238 derogó a la Ley Núm. 95, por lo cual no hay dudas de que esta nueva ley estaba destinada a promover la industria de la carne de res local. De igual manera dispuso para la reasignación de los pro-gramas relacionados, por lo cual la Oficina al amparo de la extinta Ley Núm. 95 pasó a estar adscrita a la Oficina de Ordenamiento de las Industrias Agropecuarias. Se ordenó, también, al Secretario transferir las asignaciones presu-puestarias al nuevo fondo creado.
*90 B
Nuestra Ley Suprema establece que “[n]o se aprobará ley alguna que restringa la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios”. Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 285. Análo-gamente, la Constitución de Estados Unidos dispone que “[e]l Congreso no aprobará ninguna ley con respecto al es-tablecimiento de religión alguna, o que prohíba el libre ejercicio de la misma o que coarte la libertad de palabra o de prensa; o el derecho del pueblo a reunirse pacíficamente y a solicitar al Gobierno la reparación de agravios”. Emda. I, Art. I, Const. EE. UU, L.P.R.A., Tomo 1, ed. 2008, pág. 181.
La libertad de expresión “se trata de [uno de los] dere-chos a los cuales les hemos reconocido la mayor jerarquía en nuestro ordenamiento constitucional, estamos obligados a su más celosa protección”. Muñiz v. Admor. Deporte Hípico, 156 D.P.R. 18, 24 (2002). Asimismo, dispusimos que “[l]a libertad de expresión es la quinta esencia de una sociedad democrática. De forma multidimensional, en la constelación de valores democráticos, goza de una supremacía peculiar ...”. Asoc. de Maestros v. Srio de Educación, 156 D.P.R. 754, 768 (2002).
Esta garantía constitucional tiene una doble dimensión: por un lado, garantiza al ciudadano que el Estado no inter-vendrá con su derecho a expresarse; por otro lado, prohíbe al Estado obligarlo a exponer, manifestar o adoptar expre-siones gubernamentales con las que no está de acuerdo. Esta última dimensión se conoce en la doctrina federal como “expresión compelida” y puede considerarse la dimensión negativa de la Primera Enmienda. Véase D.B. Gaebler, First Amendment Protection Against Government Compelled Expression and Association, 23 (Núm. 4) Boston College L.R. 995 (1982).
*91 Como señalara en la Opinión disidente que emitiera en E.L.A. v. Supermercados Amigo, 170 D.P.R. 459 (2007), la primera vez que el Tribunal Supremo federal se enfrentó a este aspecto negativo de la Primera Enmienda fue en West Virginia State Board of Education v. Barnette, 319 U.S. 624 (1943). Este caso se trataba de unos miembros de la congregación Testigos de Jehová quienes se rehusaban a saludar la bandera y a recitar el juramento de fidelidad a Estados Unidos. El Tribunal resolvió que el Gobierno no podía obligarlos a hacerlo, ya que dicha obligación era con-traria a la Primera y a la Decimocuarta Enmienda de la Constitución. Si bien esta decisión introdujo al ordena-miento el aspecto negativo de la Primera Enmienda no es-tableció su alcance. Gaebler, supra, pág. 998.
No fue hasta en Wooley v. Maynard, 430 U.S. 705 (1977), que el Tribunal Supremo se enfrentó nuevamente a este asunto. En este caso se retó la constitucionalidad de una ley del estado de New Hampshire que tipifica como delito mutilar el eslogan del estado Live Free or Die. Una vez más, al igual que en West Virginia, el más Alto Foro federal encontró que lo anterior violaba la Primera En-mienda en su aspecto negativo.
Ese mismo año, el Tribunal Supremo federal encontró que el obligar a unos maestros no sindicados a pagar la totalidad de una cuota de sindicación a la unión atentaba contra el aspecto negativo de la Primera Enmienda si el uso de las cuotas era utilizado para patrocinar expresiones políticas con las que éstos no estaban de acuerdo y que no tenían relación con la negociación colectiva. Abood v. Detroit Bd. of Ed., 431 U.S. 209 (1977). En este caso, a dife-rencia de los anteriores, el Tribunal Supremo tuvo la opor-tunidad de analizar la doctrina de subsidio compelido. Así, estableció lo que se conoce como “estándar de pertinencia” para establecer cuándo un mensaje puede ser subvencio-nado por un subsidio compelido sin ofender la Primera Enmienda. Según estos parámetros, un mensaje subsi- *92 diado compelidamente será válido si: (1) el mensaje está relacionado a los objetivos y propósitos del grupo, y (2) no tiene carácter político o ideológico.
En PruneYard Shopping Center v. Robins, 447 U.S. 74 (1980), PruneYard apeló una decisión del Tribunal Supremo de California que estableció que el centro comercial no podía prohibir a un grupo de ciudadanos repartir litera-tura y recoger firmas en contra de una resolución de la Organización de las Naciones Unidas repudiando al sionismo. El centro comercial argumentó que al así resolver, el Tribunal Supremo de California le obligó a utilizar su propiedad para actividades con las cuales no estaba de acuerdo. El Tribunal Supremo de Estados Unidos señaló que, dada la característica pública del centro comercial, la distribución de literatura y la recolección de firmas no im-plicaban expresión compelida por parte de los dueños del mismo.
En 1990 el Tribunal elaboró el estándar de pertinencia establecido en Abood. De esta manera invalidó un pro-grama de cuotas obligatorias destinadas a subvencionar expresiones ideológicas y políticas que nada tenían que ver con los objetivos de la colegiación compulsoria del estado de California. Keller v. State Bar of California, 496 U.S. 1 (1990).
En nuestra jurisdicción adoptamos el análisis de Abood en Colegio de Abogados de P.R. v. Schneider, 112 D.P.R. 540 (1982). Aun cuando sostuvimos la constitucionalidad de la colegiación compulsoria, resolvimos que el Colegio de Abogados no podía utilizar los dineros recolectados por las cuotas para subsidiar expresiones con las que un colegiado no estuviese de acuerdo.
Ulteriormente, los parámetros desarrollados jurispru-dencialmente por el Tribunal Supremo de Estados Unidos se aplicaron a controversias donde estaban en disputa aportaciones económicas compulsorias establecidas me-diante reglamentación y que estaban destinadas a finan- *93 ciar campañas publicitarias genéricas, entendidas como aquellas destinadas a la promoción de un producto agropecuario. En este contexto son fundamentales dos de-cisiones de dicha Curia: Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457 (1997), y United States v. United Foods, Inc., 533 U.S. 405 (2001).
En Glickman el Tribunal Supremo federal resolvió que cierta reglamentación que obligaba tanto a los agricultores que cosechaban árboles frutales como a quienes procesa-ban las frutas a contribuir a una campaña publicitaria ge-nérica, no violaba la Primera Enmienda. Esto era así ya que se trataba de una legislación de carácter económico que regulaba amplia e intensamente el mercado y estaba destinada a proveer estabilidad a este último.
En United Foods, el Tribunal llegó a la conclusión opuesta. Así, fundamentándose en Abood y Glickman, sos-tuvo que obligar a los productores de setas de marca a subvencionar una campaña publicitaria genérica de setas infringía el derecho de éstos a la libertad de expresión. Lo anterior dado a que la campaña publicitaria estaba diri-gida a promocionar las setas genéricas y esto era contrario a los intereses económicos de los productores de marca. El Tribunal expresó que en este caso la reglamentación, a diferencia de Glickman, no era una amplia y extensiva. Con-trario a lo anterior, era una cuyo fin mismo estaba en la campaña publicitaria. Conviene decir que la protección de la Primera Enmienda no sólo se extiende a aquellas expre-siones de carácter político o ideológico. En este caso, lo per-tinente es preguntarse si en la subvención de una expre-sión el Estado adelanta un fin legítimo, reglamentado en la legislación en cuestión.
Posteriormente, el Tribunal Supremo federal tuvo la oportunidad de elaborar sobre los subsidios compelidos de expresión gubernamental. En Johanns v. Livestock Marketing Assn., 544 U.S. 550 (2005), el Alto Foro federal sostuvo que el subsidio compelido de expresión gubernamental no *94 ofende de por sí los derechos garantizados al amparo de la Primera Enmienda. Lo anterior, principalmente porque los dineros recaudados por el Estado siempre se utilizarán para promover la política pública gubernamental. Id., págs. 563 — 564. En este sentido sostuvo que un impuesto a la venta e importación de carne de res destinado a costear, entre otras cosas, campañas publicitarias constituía una expresión gubernamental legítima y, por lo tanto, era im-procedente su impugnación al amparo de la Primera Enmienda. Expresó que al estar el mensaje controlado en todas sus etapas por el Gobierno Federal no podía haber duda de que se trataba de una expresión gubernamental, íd., págs. 560-561. Así es que el gobierno puede expresarse en pos de su política pública aun cuando reciba recursos de fondos privados. Ahora bien, el mensaje gubernamental no estará sujeto al escrutinio de la Primera Enmienda siem-pre que sea controlado por el gobierno en su totalidad. Pleasant Grove City v. Summun, 555 U.S. 460, 468 (2009).
III
Como estableciera al comienzo de esta discusión, la pe-ticionaria argumenta que la derogada Ley Núm. 95 infrin-gía su derecho a la libertad de expresión, ya que le compe-lía a aportar económicamente a una campaña publicitaria contraria a sus intereses económicos. Por su parte, el Es-tado Libre Asociado sostiene que esta controversia no versa sobre expresión privada compelida, sino sobre el re-querimiento de una aportación económica impuesta por la Asamblea Legislativa sobre actividad ampliamente regu-lada que a su vez se utilizó parcialmente para financiar una expresión gubernamental legítima.
Esta controversia es idéntica a la que tuvimos ante nuestra consideración en E.L.A. v. Supermercados Amigo, ante. En aquella oportunidad, por estar igualmente divi- *95 dido el Tribunal, se confirmó la determinación del Tribunal de Apelaciones. Este Tribunal resolvió que la referida Ley Núm. 95 era constitucional de su faz y que ésta perseguía un fin legítimo gubernamental que no era otro que promo-ver el bienestar de la ciudadanía mediante una nutrición adecuada. Id., pág. 459.
En aquel momento emití una opinión disidente que se basó en un doble análisis. Primeramente, se atendió el asunto de si el mensaje objetado por la peticionaria consti-tuía o no una expresión gubernamental. Así, expresé que anteriormente este Tribunal se había manifestado sobre el poder que tiene el gobierno para expresarse y su deber de informar a la ciudadanía de asuntos vitales para el País. De esta manera, recordamos a P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995), y Romero Barceló v. Hernández Agosto, 115 D.P.R. 368 (1984), para señalar que el deber de infor-mar está íntimamente relacionado al poder que le asiste al ciudadano para fiscalizar la obra gubernamental. Sin embargo, también afirmé que en P.P.D. v. Gobernador II, 136 D.P.R. 916 (1994), esta Curia fue enfática al rechazar el argumento de que al gobierno le asiste un derecho consti-tucional a expresarse para informar a la ciudadanía sobre la gestión gubernamental.
Además, sostuve que la expresión gubernamental es un corolario del deber de informar. En este sentido, entendí en aquel entonces que para poder informar responsable-mente, el gobierno debe participar en el “mercado de las ideas”. Este último es piedra angular de cualquier sociedad democrática y la participación del gobierno en el mismo contribuye a la transparencia, por un lado, y a la fiscaliza-ción ciudadana, por el otro. Ahora bien, el mensaje guber-namental —salvo cuando proviene efectivamente del go-bierno y está estrechamente vinculado a la gestión gubernamental— no puede lesionar el derecho a no expre-sarse de aquel que entiende que el mensaje que se lleva es contrario a sus intereses.
*96 En esta controversia, al igual que la de Supermercados Amigo, el mensaje objetado no parece estar estrechamente relacionado a la gestión gubernamental. Por el contrario, se trata más bien de una campaña publicitaria sufragada con dineros de un fondo que claramente estaba destinada a promover la industria de carne de res del País. Consta en los autos copia del diseño de dicha campaña como así tam-bién de los anuncios publicados en diferentes medios de prensa escrita. Dichos anuncios son suscritos por el Fondo de Fomento Industria Carne de Res y “Carne Fresca del País”. Es fundamental que a la hora de determinar si un mensaje proviene o no del Estado auscultar quién es su emisor. Lo anterior, principalmente, porque si por algo es que los mensajes gubernamentales no están sujetos a im-pugnación al amparo de la Primera Enmienda es porque el proceso democrático mismo se encarga de refrendarlos o no. En este sentido, para que el electorado pueda decidir si está de acuerdo o no con determinado mensaje guberna-mental es imprescindible que sepa que viene del gobierno. En el caso ante nuestra consideración es muy difícil para la ciudadanía determinar quién era el emisor del mensaje. De igual manera, sería un absurdo pensar que los importado-res de carne de res por sí mismos tuviesen la capacidad de movilizar a la ciudadanía para que desautorice un mensaje gubernamental sufragado con su dinero y que es lesivo a los intereses económicos de éstos.
A diferencia de la Opinión disidente de la Jueza Aso-ciada Señora Fiol Matta, soy del criterio de que lo expre-sado en la Ley Núm. 95 no constituye un mensaje guber-namental y es, más bien, una expresión comercial sufragada con fondos privados. Es por ello que me reafirmo en lo que dije en Supermercados Amigo en cuanto a que a este tipo de mensaje no está cobijado por la doctrina de expresión gubernamental. Por lo cual no le asiste la razón al Estado en cuanto a este planteamiento.
*97 Una vez determinado que la expresión estatal contenida en la Ley Núm. 95 no podría entenderse como expresión gubernamental, pasé a considerar el argumento sobre si la industria de la carne de res es altamente reglamentada, según adujo el Estado. Análogamente, el Estado también alega que la actividad comercial de esta industria está am-pliamente regulada y que, por lo tanto, podría imponer im-puestos a la misma. Sostiene que debemos basar nuestra determinación en lo expresado por el Tribunal Supremo federal en United Foods, ante y en Glickman, ante. Me sostengo en el criterio de que el Estado confunde qué es lo que constituye una industria “ampliamente” regulada. Es claro que la extinta Ley Núm. 95 sólo buscaba promover la industria de la carne de res en Puerto Rico. Nada dice el texto de ésta sobre control de precios, imposición de cuotas u otra disposición semejante. En este sentido, no se puede entender que la industria de carne de res en la Isla sea altamente reglamentada, máxime cuando no hay precios uniformes ni ningún otro tipo de restricción, ni se mani-fiesta la búsqueda de estabilidad en el mercado.
Así las cosas, soy del criterio que al amparo de la Cons-titución del Estado Libre Asociado de Puerto Rico, la dero-gada Ley Núm. 95 infringió el derecho a la libertad de expresión de la peticionaria. Concluyo así, dado que no hay dudas de que los fondos utilizados para promover la carne fresca del País provenían del Fondo establecido por dicha ley y al cual tanto los productores como los importadores estaban obligados a aportar. De los documentos anejados en los autos se desprende que si bien el texto legal estable-ció que se realizaría una campaña publicitaria genérica, esto no fue lo que sucedió. La campaña de mercadeo y pu-blicidad sólo promocionó la carne de res producida en el País y, por lo tanto, contrarió los intereses económicos de la aquí peticionaria. Asimismo, soy del criterio de que no existe interés legítimo del Estado que justifique exigirle a la peticionaria financiar una campaña publicitaria que va en detrimento de sus intereses comerciales.
*98 Una vez más diré que el gobierno no puede, sin lacerar el derecho a la libertad de expresión de un competidor, compeler a una parte a sufragar una acción gubernamen-tal que es claramente favorable a la competencia. Hacerlo constituye una clara violación de derechos fundamentales básicos habidos y garantizados constitucionalmente en un gobierno democrático.
IV
La atención forzada y equivocada de la mayoría de este Tribunal en este caso me obliga a unas últimas palabras a modo de epílogo.
A
Es norma de autolimitación judicial la que establece que un tribunal apelativo no considerará planteamientos sobre los cuales el foro primario no ha tenido oportunidad de expresarse. Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 145 (1998); Trabal Morales v. Ruiz Rodríguez, 125 D.P.R. 340 (1990). Aunque hemos sostenido que dicha doctrina no es una inquebrantable, Santiago Cruz v. Hernández Andino, 91 D.P.R. 709 (1965), el acoger planteamientos no expresa-dos ante el tribunal inferior descansa en nuestra sana dis-creción y está estrechamente relacionado a nuestra obligación de impartir justicia. Vega v. Yiyi Motors, Inc., 146 D.P.R. 373 (1998). De igual manera, no puede ser un fun-damento para no atender los casos en los méritos el hecho que se varíe la teoría del caso a nivel apelativo. Santiago Cruz v. Hernández Andino, supra. Pero este caso no trata de esta situación.
De los hechos habidos en los autos de este caso queda diáfanamente establecido que entrar a dirimir si la cláu-sula de comercio interestatal en su aspecto durmiente *99 aplica a Puerto Rico es, jurídicamente, innecesario. La con-troversia ante nuestra consideración no requiere que que-brantemos los principios que hemos establecido y reafir-mado con el pasar de los años. No estamos ante un caso donde de no aplicar una teoría que el tribunal de instancia no tuvo la oportunidad de considerar redunde en un fra-caso de la justicia. Tampoco nos hallamos en uno de esos momentos en que, de no acoger argumentos presentados por primera vez en el foro apelativo, estaríamos abdicando a nuestra función principalísima: impartir justicia.
Soy del criterio de que este caso pudo ser dispuesto atendiendo el segundo señalamiento de error que sí estuvo ante la consideración del foro primario. Es por eso que, a diferencia de la mayoría de los miembros de este Tribunal, entiendo que no incidió el foro intermedio al no considerar los argumentos presentados por la peticionaria en cuanto a que la derogada Ley Núm. 95 es inconstitucional por violar la cláusula de comercio interestatal en su aspecto durmiente.
B
Para entender por qué la cláusula de comercio interes-tatal de la Constitución de Estados Unidos en su estado durmiente no aplica a Puerto Rico, conviene hacer un breve recuento histórico. La respuesta a este interrogante está en la genealogía de la relación entre Puerto Rico y Estados Unidos y su desarrollo a través del tiempo. Veamos.
El 10 de diciembre de 1898 se firmó en París el Tratado de Paz entre Los Estados Unidos de América y El Reino de España (Tratado de París), en virtud del cual se puso fin a la Guerra Hispanoamericana. Mediante éste España cedió a Estados Unidos la Isla de Puerto Rico, entre otras. Art. Ill, Tratado de París de 1898, L.P.R.A., Tomo 1, ed. 2008, *100 págs. 16-23. De esta manera, Puerto Rico se convirtió en un territorio no incorporado de Estados Unidos regulado según la cláusula territorial. Esta última, expresamente dispone que
[e]l Congreso podrá disponer de, o promulgar todas las re-glas y reglamentos necesarios en relación con, el territorio o cualquier propiedad perteneciente a los Estados Unidos. Art. IV, Sec. 3, Const. EE. UU., L.P.R.A., Tomo 1, ed. 2008, pág. 177.
Sin embargo, lo anterior no implicó de forma alguna que Puerto Rico pudiera considerarse parte integral de la nación Americana al amparo de una organización política similar a los estados de Estados Unidos. Véase Carta Orgánica de 1900 conocida como Ley Foraker. Véanse, además: De Lima v. Bidwell, 182 U.S. 1 (1901) (Puerto Rico es un territorio de Estados Unidos); Downes v. Bidwell, 182 U.S. 244 (1901) (la Constitución de Estados Unidos no se extiende a los territorios no incorporados); Dooley v. United States, 182 U.S. 222 (1901) (reafirmando en De Lima, ante), conocidos como los Casos Insulares.
El 2 de marzo de 1917 el Congreso de Estados Unidos aprobó la Ley Orgánica Jones. Esta tenía como fin principal instaurar un gobierno civil en la Isla y las islas adya-centes y regir la relación entre éstas y la metrópolis. Igual-mente, otorgó la ciudadanía estadounidense a los habitantes de Puerto Rico y les concedió una carta de derechos. Asimismo, autorizó a la Legislatura de Puerto Rico a imponer contribuciones, dentro de ciertos límites, y estableció que la cláusula de comercio interestatal no apli-caba a la Isla, entre otras disposiciones. Véase Ley de Re-laciones Federales, L.P.R.A., Tomo 1, ed. 2008, págs. 220-261.
A pesar de la instauración del gobierno civil, el Tribunal Supremo de Estados Unidos dejó claro que la concesión de la ciudadanía no tuvo el efecto de incorporar a Puerto Rico a Estados Unidos. Véase A. Fernós Isern, Estado Libre *101 Asociado de Puerto Rico: antecedentes, creación y desarrollo hasta la época presente, 2da ed., Río Piedras, E.D.U.P.R., 1988, págs. 32-35. Por lo cual, Puerto Rico continuó con el distintivo de ser un territorio no incorporado y por lo tanto distinguible de los estados federados.
No fue hasta 1947 que el Congreso de Estados Unidos confirió a la Isla el poder para escoger su propio gobernador. Véase R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, págs. 479-480. Posteriormente, el 3 de julio de 1950 se aprobó la Ley Pública 600, Ley de 3 de julio de 1950, cap. 446, 64 Stat. 314, mediante la cual el Congreso autorizó que Puerto Rico organizara su propio gobierno mediante la adopción de su propia Constitución. Esta ley dispuso que la Ley Jones o Ley de Relaciones Fe-derales con Puerto Rico continuaría en vigor a excepción de ciertas disposiciones contenidas en su Artículo 5. Asimismo estableció que debía ser aprobada en un referéndum y de éste contar con el apoyo mayoritario de los puertorrique-ños, la Asamblea Legislativa quedaría investida para con-vocar una convención constituyente encargada de redactar una Constitución para Puerto Rico.
Así las cosas, el pueblo puertorriqueño aprobó en refe-réndum abrumadoramente el texto constitucional redac-tado por la Asamblea Constituyente y el 25 de julio de 1952 entró en vigor la Constitución del Estado Libre Asociado de Puerto Rico. Este pacto entre Estados Unidos y Puerto Rico le confirió autonomía al gobierno local en cuanto a sus propios asuntos, haciendo innecesaria entonces la inter-vención del Congreso según la cláusula territorial como ha-bía sido hasta el momento. De igual manera, esta nueva forma de relación política entre Estados Unidos y Puerto Rico no convirtió al Estado Libre Asociado en un estado de la Unión ni tampoco tuvo el efecto de hacerle parte integral de la misma, como lo es un territorio incorporado.
*102 La fundación del Estado Libre Asociado conllevó, nece-sariamente, “un salto cualitativo significativo e importante en gobierno propio para Puerto Rico”. R. Hernández Colón (J. Hernández Mayoral, P. Hernández Rivera, eds.), Hacia la meta final: el nuevo pacto — un paso adelante, San Juan, Editorial Calle Sol, pág. 7. El efecto real del pacto ofrecido por Estados Unidos y aceptado por el Pueblo de Puerto Rico, fue la renuncia (relinquishment) del Congreso de Estados Unidos “a su control sobre la organización de los asuntos locales de la isla, y como resultado Puerto Rico, como los estados, es una entidad política autónoma, sobe-rana sobre los asuntos no gobernados bajo la Constitución de Estados Unidos”. (Escolios omitidos). íd. Véanse, además: Calero Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663 (1974); Examining Bd. v. Flores de Otero, 426 U.S. 572 (1976); Rodríguez v. Popular Democratic Party, 457 U.S. 1 (1982).
Esta renuncia del Congreso a sus poderes plenarios so-bre un territorio puede hacerse total o gradualmente. Así lo expresó en 1971 el entonces Assistant Attorney General, del Departamento de Justicia de Estados Unidos, William Rhenquist:
[T]he Constitution does not inflexibly determine the incidents of territorial status, i.e., that Congress must necessarily have the unlimited and plenary power to legislate over it. Rather, Congress can gradually relinquish those powers and give what was once a Territory an ever-increasing measure of self-government. Such legislation could create vested rights of a political nature, hence it would bind future Congresses and cannot be “taken backward” unless by mutual agreement. W. Rhenquist, Memorándum, “Micronesian Negotiations”, 18 de agosto de 1971, Office of Legal Counsel, citado en Hernández Colón, op. cit., pág. 8.
En 1980, en Harris v. Rosario, 446 U.S. 651 (1980), el Tribunal Supremo de Estados Unidos dejó claro que Puerto Rico no puede considerarse como un estado y que, por lo tanto, el Congreso podía tratar a la Isla de manera *103 diferente. Aunque lo resuelto en Harris, ante, ha sido ob-jeto de múltiples interpretaciones, soy del criterio de que lo único resuelto en esa ocasión fue que en virtud de la cláu-sula territorial Estados Unidos puede tratar de manera diferente a Puerto Rico en cuanto a programas de asisten-cia nutricional diseñado para los estados. En este sentido me hago eco de las palabras de don José Trías Monge, cuando sostuvo que
... la cláusula territorial puede y debe examinarse desde dos vertientes distintas: como fuente del poder del Congreso para adoptar determinada medida que afecte a entidades vincula-das de algún modo a los Estados Unidos, independientemente del grado de gobierno propio o soberanía que hayan alcanzado, y como indicio del status de tales entidades y facultad del Congreso para legislar para ellas prácticamente a su antojo. J. Trías Monge, El Estado Libre Asociado ante los Tribunales, 1952-1994, 64 Rev. Jur. U.P.R. 1, 26 (1995).
En consecuencia, es evidente que Puerto Rico mantiene una relación sui géneris con Estados Unidos, toda vez que ésta no puede compararse con un estado de Estados Unidos ni con un territorio al amparo de los poderes plenarios del Congreso. Desde la aprobación de la Constitución del Estado Libre Asociado, Puerto Rico opera dentro de un sis-tema dual de soberanías similar al de los estados, más de hechura propia. En este sentido, antes de hacer cualquier análisis sobre la aplicación o no de una cláusula constitucional federal a Puerto Rico, es imprescindible considerar que “[d]esde sus inicios, la relación entre Estados Unidos y Puerto Rico ha estado sujeta al principio fundamental de que la Constitución federal no aplica enteramente a Puerto Rico, por no ser ni haber sido nunca la isla un territorio incorporado a la Unión Americana ni formar parte integral de Estados Unidos”. (Enfasis en el original). Asoc. Importadores de Cerveza v. E.L.A., 171 D.P.R. 140, 175 (2007) (Sentencia, Op. de conformidad del Juez Asociado, Sr. Fuster Berlingeri). Es por ello que en el marco de ésta no debemos perder de perspectiva que, en ausencia de expresión *104 del Congreso, es el Tribunal Supremo federal el encargado de establecer que disposiciones de la Constitución se ex-tienden al Estado Libre Asociado.
Dentro de este escenario es claro que en el estado de derecho vigente la cláusula de comercio interestatal no aplica a Puerto Rico. Esto, ya que dicha disposición no es un derecho fundamental ni tampoco ha sido extendida a Puerto Rico por el Congreso ni por el Tribunal Supremo de Estados Unidos, aun cuando este último tuvo la oportunidad de atender el asunto tan recientemente como en el 2008. Véase Puerto Rico Association of Beer Importers, Inc., et al. v. Commonwealth of Puerto Rico et al., certiorari denegado el 17 de marzo de 2008. Cabe preguntarse enton-ces si una cláusula que no aplica a Puerto Rico en su sen-tido vivo puede entonces aplicar en su aspecto durmiente. Soy del criterio de que no. Principalmente porque el as-pecto durmiente de dicha cláusula es una limitación al po-der de los estados y Puerto Rico, claramente, no goza de ese estatus.
Hay quienes argumentan que por contener la Ley de Relaciones Federales una disposición con un lenguaje similar al jurisprudencialmente formulado para definir el lla-mado aspecto durmiente o negativo de la cláusula de co-mercio interestatal, éste se ha extendido a Puerto Rico. Véase E.L.A. v. Supermercados Amigo, supra (Opinión disidente del Juez Asociado Señor Efraín Rivera Pérez). Dicha disposición establece que en el marco del pacto estable-cido entre el Estado Libre Asociado y Estados Unidos, que la Legislatura de Puerto Rico no podrá establecer distin-ción alguna entre los productos importados de Estados Unidos o países extranjeros y los productos producidos localmente. Art. 3 de la Ley de Relaciones Federales, L.P.R.A., Tomo 1. Sin embargo, lo anterior no se pude ni debe interpretar como una extensión de la cláusula de co-mercio interestatal en su estado durmiente al Estado Libre Asociado, que como vimos limita el poder de los estados. *105 Sería jurídicamente impropio decir que dicha disposición es análoga a una prohibición total de aprobar legislación que de alguna manera esté destinada a gravar ciertos bie-nes y productos que provienen de Estados Unidos. Concluir así sería limitar extremadamente la capacidad de imponer impuestos de nuestra Asamblea Legislativa.
Como vemos, está diáfanamente establecido que Puerto Rico, al no ser un estado, no queda afectado por la cláusula de comercio interestatal en su aspecto vivo, mucho menos en su aspecto durmiente. Véase el Art. 38 de la Ley de Relaciones Federales; R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416 (1964). En el ámbito federal, como expresára-mos anteriormente, el Tribunal Supremo de Estados Unidos ha rehusado resolver si dicha cláusula aplica a Puerto Rico. Si bien los foros federales han expresado que la cláusula en controversia en su aspecto durmiente sí aplica al Estado Libre Asociado, tales expresiones no vinculan a este Tribunal. Véase Trailer Marine Transport Corp v. Rivera Vázquez, 977 F.2d 1 (1er Cir. 1992).
En lógica se sostiene que si un término se usa en dife-rentes sentidos en un argumento se cae en un tipo de fala-cia denominada equivocación. Así se reconoce que el signi-ficado de las mayorías de las palabras depende del contexto en que se encuentran. Se incurre en una falacia de equivocación cuando, dentro de un razonamiento lógico, se confunde accidental o deliberadamente el significado de las mismas o se utilizan en una acepción que no es propia para su contexto. Véase I.M. Copi y C. Cohen, Introducción a la Lógica, Editorial Limusa, D.F., 2003.
Cónsono a lo anterior, el razonamiento de la mayoría es falaz, en su variante de equivocación. Toda vez que razona como si Puerto Rico fuese estado, cuando claramente no lo es y se ampara en que la autonomía conferida al Estado Libre Asociado es similar a la de los estados de la Unión para limitar el poder que dicha autonomía, en el marco de un pacto con Estados Unidos, nos confirió. Por lo tanto, la *106 extensión ex propio vigore de la cláusula de comercio en su aspecto durmiente a Puerto Rico es, cuando menos, equivocada.
V
Por los fundamentos antes expresados, entiendo que la Ley Núm. 95 violenta el derecho constitucional a la liber-tad de expresión, ya que obliga a los peticionarios a subsi-diar un mensaje contrario a sus intereses económicos. De igual manera disiento de la errónea apreciación mayorita-ria sobre que la cláusula de comercio en su estado dur-miente aplica a Puerto Rico.
— O —

(1) Adujo los señalamientos de error siguientes:
1. “Erró el honorable Tribunal de Apelaciones al determinar que la intención legislativa de la derogada Ley 95, según implantada, no era promocionar la carne de res del país para contrarrestar el efecto negativo ocasionado por las importaciones de carne a Puerto Rico. El tribunal basó su determinación en el texto escrito de la Ley Núm. 95; no en su historial legislativo ni en su aplicación”.
2. “Erró el honorable Tribunal de Apelaciones al determinar que, al aplicar la derogada Ley 95, no se violaron derechos a la libre asociación y expresión de los importadores. Aunque toda la evidencia en autos demuestra lo contrario, el tribunal apelativo determinó sumariamente que la promoción realizada a favor de la carne de res del país era de naturaleza informativa y/o educativa sobre la industria en general”.
3. “Erró el honorable Tribunal de Apelaciones al negarse a considerar que la aportación ordenada por el Tribunal de Primera Instancia viola la cláusula de comer-cio interestatal de la constitución de los Estados Unidos en su ‘estado durmiente’ ”.
4. “Erró el honorable Tribunal de Apelaciones al determinar que la Ley Núm. 238 provee para que cualquier dinero aportado por los importadores a partir del 18 de septiembre de 1996 sea asignado exclusivamente al fondo establecido para el sector de la carne de res local, y sea utilizado para adelantar la competencia en contra de los importadores”. Petición de certiorari, pág. 5-6.